### THE STAMFORD HOSPITAL v. NELLY E. VEGA
### (15162)

Peters, C. J., and Borden, Berdon, Katz and Palmer, Js.

Argued October 24, 1995—officially released April 16, 1996

*Donald T. Ridley*, pro hac vice, with whom was *Ikech-ukwu Umeugo*, for the appellant (defendant).

*Paul E. Knag*, with whom were *Martin A. Clarke* and, on the brief, *William H. Narwold* and *Charles D. Ray*, for the appellee (plaintiff).

*Susan Snook* filed a brief for the Watchtower Bible and Tract Society of New York, Inc., as amicus curiae.

BORDEN, J. The dispositive issues in this certified appeal are whether: (1) the Appellate Court improperly

dismissed the defendant's appeal as moot; and (2) the trial court improperly granted the plaintiff's request for an injunction permitting it to administer blood transfusions to the defendant against her wishes. The defendant, Nelly E. Vega, a patient under the care of the plaintiff, Stamford Hospital (hospital), appeals, following our grant of certification,[1] from the judgment of the Appellate Court dismissing as moot Vega's appeal from the judgment of the trial court, which had granted the hospital's request for an injunction permitting it to administer blood transfusions to Vega. We conclude

---

[1] We granted Vega's petition for certification to appeal, in order to consider the following issue: "Was the Appellate Court correct in dismissing the defendant's appeal for mootness in view of the defendant's claim that it was 'capable of repetition, yet evading review?' "

We also ordered, sua sponte, that the parties address the issues that Vega had raised in her appeal to the Appellate Court, but which that court did not reach, namely: (1) "Does a hospital have standing to assert the state's parens patriae interest in the welfare of a minor child whose adult parent is hospitalized and is refusing allegedly lifesaving medical treatment?" (2) "Is the state's alleged parens patriae interest in the welfare of a minor child whose parent is refusing allegedly lifesaving treatment for religious and medical reasons a compelling state interest that overrides the parent's common law right of bodily self-determination, federal constitutional rights of bodily self-determination and religious free exercise, and state constitutional right of religious liberty?" and (3) "Is the forcible administration of unwanted medical treatment to a competent adult the least restrictive, least intrusive means of protecting the state's alleged parens patriae interest in the welfare of that adult's minor child?" *Stamford Hospital* v. *Vega*, 231 Conn. 944, 653 A.2d 827 (1994).

As we explain in the text of this opinion, because of the extraordinary procedural posture of this case we have rephrased some of the certified questions in order to render them more accurate in framing the issues that this case presents. Thus, as rephrased, the questions in this case are as follows:

(1) Was the Appellate Court correct in dismissing Vega's appeal for mootness in view of her claim that it was capable of repetition, yet evading review?

(2) Did the hospital have standing to challenge Vega's refusal of lifesaving blood transfusions?

(3) Did the trial court's issuance of an injunction permitting the hospital to perform blood transfusions on Vega violate her: (a) common law right of bodily self-determination; (b) federal constitutional right of bodily self-determination; (c) federal constitutional right of religious free exercise; and (d) state constitutional right of religious liberty?

that: (1) the appeal falls within the exception to the mootness doctrine for cases that are capable of repetition, yet evading review; and (2) under the circumstances of this case, the trial court's order permitting the hospital to transfuse Vega against her will violated her common law right of bodily self-determination. Accordingly, we reverse the judgment of the Appellate Court.

The facts and procedural history are undisputed. On Friday, August 26, 1994, Vega was admitted as a patient to the hospital to deliver her first child. That evening, Vega, a Jehovah's Witness, executed a release requesting that no blood or its derivatives be administered to her during her hospitalization, and relieving the hospital and its personnel of liability for any adverse effects that might result from her refusal to permit the use of blood in her treatment.[2] Vega's husband also signed the release.

According to the amicus curiae, which is the Watchtower Bible and Tract Society of New York, Inc., the

Although these questions are somewhat different from the original certified questions, the issues raised by the questions as we have rephrased them were fully explored at oral argument. Moreover, to the extent that the questions as rephrased differ from or are broader than the original questions, neither party has cause for complaint. Vega has prevailed in this appeal on the basis of the rephrased questions. Although the hospital has not prevailed, the rephrased questions and our resolution of them adequately encapsulate the essence of the parties' arguments presented in the original questions.

[2] The release signed by Vega was a standardized form given to her by the hospital. The form provided: "Patient's release form for refusal of blood. I request that no blood or blood derivatives be administered to [name] during this hospitalization. I hereby release The Stamford Hospital, its personnel, the responsible physicians and any other person participating in my case from any liability for any unfavorable reactions or any untoward results due to refusal to permit the use of blood and its derivatives. The risks attendant to my refusal have been explained to me, and I understand that if I should need a blood transfusion and, that if the same is not done, my chances for regaining normal health are seriously reduced, and that, in all probability, my refusal of such treatment or procedure will seriously imperil my life and may result in my death."

parent organization of the Jehovah's Witnesses, the Jehovah's Witnesses comprise a Christian religious faith whose adherents devote themselves to the study of God's word and strive to apply its counsel in all aspects of their lives. Jehovah's Witnesses believe that the scripture directs them to abstain from receiving blood, and that an individual who receives blood will be denied resurrection and eternal salvation. They also consider a nonconsensual blood transfusion to be a gross physical violation as well as a violation of the individual's values. Accordingly, when Jehovah's Witnesses seek medical care, they regularly refuse blood transfusions.

On August 27, 1994, Vega delivered a healthy baby. Following the delivery, Vega bled heavily as a result of a retained piece of the placenta. Her obstetrician, Savita Sood, recommended a dilation and curettage in order to stop the bleeding. Although Vega agreed to permit Sood to perform the dilation and curettage, she refused to allow a blood transfusion. Prior to undergoing the procedure, she had signed another release requesting that she be given no transfusions and releasing the hospital from liability. Despite the dilation and curettage, Vega continued to hemorrhage.

Vega's physicians tried a number of alternatives to the use of blood, but her condition continued to worsen. Eventually, when she was having difficulty breathing, her physicians placed her on a respirator in the intensive care unit. Vega and her husband maintained throughout these events that, although she might die without blood transfusions, it was against their religious beliefs to allow the use of blood. Because Sood and the other physicians involved in Vega's care believed that it was essential that she receive blood in order to survive, the hospital, at 2 a.m. on August 28, 1994, filed a complaint against Vega, requesting that the court issue an injunc-

tion that would permit the hospital to administer blood transfusions to her.[3]

The trial court convened an emergency hearing at the hospital at 3:25 a.m. on August 28. Although Vega's attorney, who was en route to the hospital, had not yet arrived, the court appointed Vega's husband as her guardian ad litem and began hearing testimony. Vega's doctors testified that they had exhausted all nonblood alternatives and that, with reasonable medical certainty, she would die without blood transfusions. Her husband testified that, on the basis of his religious beliefs as a Jehovah's Witness, he continued to support his wife's decision to refuse transfusions and believed that she would take the same position if she were able to participate in the hearing.

The court, relying on the state's interests in preserving life and protecting innocent third parties,[4] and not-

---

[3] The complaint characterized Vega as "a pregnant woman who is severely hemorrhaging." At the time the complaint was filed, however, Vega was no longer pregnant. This case, therefore, does not involve the issue of whether Vega's refusal of blood transfusions endangered the health of an unborn child. It is unclear whether Vega was still bleeding when the complaint was filed, but at the time of the hearing, the bleeding had ceased.

[4] In reaching its decision to grant the injunction requested by the hospital, the trial court concluded that these state interests outweighed Vega's interest in refusing the blood transfusions. Vega and the hospital agree that a state may have interests that override a patient's decision to forego certain forms of medical treatment. We have never expressly adopted such a position, although the concurring opinion in *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 716, 775 A.2d 596 (1989), identified four such state interests, as did the trial court in *Foody* v. *Manchester Memorial Hospital*, 40 Conn. Sup. 127, 133, 483 A.2d 713 (1984). The four interests are: (1) the preservation of life; (2) the protection of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. Because we are concerned here with a conflict between Vega's rights and the hospital's interests, rather than between Vega's rights and the interests of the state, we need not decide in this case whether these four interests, or any other interests for that matter, may be asserted by the state in an attempt to override a patient's decision to refuse medical treatment. Because, however, many of the arguments advanced by the parties assume, and the trial court relied on, these state interests, and in light of

ing that Vega's life could be saved by a blood transfusion, granted the hospital's request for an injunction permitting it to administer blood transfusions to her. The court then stayed the order until Vega's attorney had arrived and had been given an opportunity to present argument and additional evidence.[5] At 6:20 a.m. on August 28, the court reinstated its judgment permitting the hospital to administer blood transfusions to Vega and terminated the stay incident to any appeal taken by Vega. Vega was then given blood transfusions, recovered, and was discharged from the hospital.

Vega appealed to the Appellate Court from the trial court's judgment. The hospital moved to dismiss the appeal on the ground of mootness, and the Appellate Court granted the hospital's motion. This certified appeal followed.

I

We first consider the issue of mootness. The Appellate Court granted the hospital's motion to dismiss the appeal as moot, rejecting Vega's arguments that (1) there were collateral consequences[6] flowing from the

the fact that the interests of the state are not dispositive here, we shall, for purposes of this appeal, also assume, without so deciding, that the state may have interests it wishes to assert in a case such as this.

[5] The bulk of the proceedings involving Vega's attorney is not contained in the transcript. The hearing was tape recorded, but the tape ran out shortly after Vega's attorney had begun his argument. The parties stipulated to the substance of the testimony that was not recorded.

[6] In response to the hospital's motion to dismiss the appeal, Vega argued that, although the appeal appeared to be moot because she had been given the transfusions and had recovered, appellate review of the trial court's order was necessary in order to determine certain collateral rights and liabilities of the parties. Specifically, she contended that it might be determined that: (1) the bleeding she experienced in the hospital was the result of malpractice; (2) the hospital's repudiation of the releases signed by Vega constituted a breach of the hospital's contractual or fiduciary duty to her; or (3) the administration of the transfusions was not in conformity with the trial court's order. Should any of these conditions exist, Vega argued, an improper ruling by the trial court should not be permitted to stand and possibly shield the hospital or its doctors from liability.

trial court's order, and (2) the appeal fell within the exception to the mootness doctrine for issues of public importance that are capable of repetition, yet evading review.

Subsequent to the Appellate Court's ruling, we decided *Loisel* v. *Rowe,* 233 Conn. 370, 660 A.2d 323 (1995), in which we clarified the standards for determining whether an otherwise moot case is nonetheless justiciable because it is capable of repetition, yet likely to evade review. We, therefore, requested that the parties to this appeal address the question of what impact, if any, *Loisel* has on this case. The hospital no longer contends that the case is moot because it concedes that, under the criteria we set forth in *Loisel,* this case is capable of repetition, yet is likely to evade review. Notwithstanding the hospital's concession, and the resulting lack of dispute between the parties, because the question of mootness implicates our subject matter jurisdiction; *Gagnon* v. *Planning Commission,* 222 Conn. 294, 297, 608 A.2d 1181 (1992); we consider the issue of mootness.

"[F]or an otherwise moot question to qualify for review under the 'capable of repetition, yet evading review' exception, it must meet three requirements. First, the challenged action or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance." *Loisel* v. *Rowe,* supra, 233 Conn. 382. All three requirements must be met in order for

this exception to the mootness doctrine to apply. Id., 382–83. We conclude that this case satisfies all three requirements.

A challenge to the issuance of an injunction permitting the administration of nonconsensual blood transfusions will virtually always become moot long before appellate litigation can be concluded or even, as in this case, initiated. Of necessity, a medically necessary blood transfusion must be accomplished, if at all, as soon as reasonably possible after its need becomes apparent to the patient's health care provider. Once a court order is issued permitting such a transfusion against the patient's will, and the court lifts any stay of that order, as it will inevitably do, we cannot expect the health provider that sought the order to await the outcome of an appeal before complying with the order. Thus, any order that is challenged on appeal is, by its very nature, of such limited duration that it is virtually certain that it will become moot before appellate litigation can be concluded.

Furthermore, although Vega herself may not again be subjected to nonconsensual blood transfusions, she is nonetheless a suitable party to bring this appeal. It is reasonably likely that the issues raised in this appeal will arise in the future when other Jehovah's Witnesses experience medical conditions that require blood transfusions.[7] The amicus informs us that, in the six years

---

[7] Although we conclude, for purposes of mootness analysis, that Vega's religious affiliation satisfies the second requirement of *Loisel*, by establishing her as a member of an identifiable group for whom the issue of nonconsensual blood transfusions is likely to recur, her religious affiliation does not, as our discussion of the merits of the case in part II B of this opinion indicates, enter into our decision regarding whether the hospital's interests were sufficient to override Vega's decision to refuse blood transfusions. Furthermore, our conclusion that, in this case, Vega's religious affiliation satisfies the second requirement of *Loisel* does not preclude a determination, in a future case, that a patient who refuses blood transfusions but who is not a Jehovah's Witness also meets that requirement of *Loisel*. Because we

preceding this appeal, it received reports of, or was directly involved with, fifteen instances in Connecticut in which Jehovah's Witnesses encountered problems related to their refusal of transfusions. The hospital certainly expects the issue to recur, as is indicated by the fact that it has a release form specifically directed to the refusal of transfusions. Thus, as a member of an identifiable group for whom the issue of nonconsensual blood transfusions can reasonably be expected to recur, Vega is an appropriate surrogate for others who will be confronted with the issue.

Finally, the issues presented in this appeal are of public importance. This case requires us to resolve a tension between, on the one hand, a hospital's understandable desire to administer a recognized form of treatment in order to save its patient's life and, on the other hand, the patient's right of bodily self-determination. This case may impact any person in this state who enters a hospital and, having chosen nonblood treatment, is then confronted with circumstances in which the hospital insists that blood transfusions are necessary. At the very least, this case is likely to have a significant impact on the Jehovah's Witnesses residing in this state, who, according to the amicus, number more than 23,000. Moreover, the twenty-four general medical and surgical hospitals[8] in this state that are likely to be called upon to treat patients who wish not to be transfused rightfully need reasonable guidance regarding their obligations when confronted with a request by a patient not to administer a blood transfusion.

are not faced with that factual situation here, we need not resolve that issue now.

[8] We take judicial notice of the records of the American Hospital Association that indicate that there are currently twenty-four general medical and surgical hospitals in this state. American Hospital Association, Guide to the Health Care Field (1995–96).

## II

We next turn to the issues that Vega had raised before the Appellate Court, but which that court did not reach. We begin by stressing that this case comes to us with an extraordinary procedural history. The hearing before the trial court took place in the middle of the night, under extreme emergency conditions that were not conducive to the ability of either party to develop fully its arguments. Moreover, Vega was not represented by counsel at the outset of the hearing and, of that portion of the hearing in which her attorney was present, most was not recorded. As a result, the record is sparse. The Appellate Court, moreover, dismissed the appeal without opinion. In granting Vega's petition for certification to appeal, therefore, we simply adopted the questions that she had sought to present to the Appellate Court.[9] After hearing the parties, however, and considering the case more fully, we conclude that the certified questions do not properly frame the issues that must be resolved. We therefore rephrase the certified questions as required. We recognize that the parties framed their arguments to conform to the certified questions. We must endeavor, therefore, to glean from the arguments presented the information needed to decide the certified questions as we have rephrased them.

### A

We first address the issue of standing. Although the question of standing was not raised before the trial court, we nonetheless address it on appeal because standing, like mootness, implicates a court's subject matter jurisdiction, which may be raised at any point in judicial proceedings. *DiBerardino* v. *DiBerardino*, 213 Conn. 373, 377, 568 A.2d 431 (1990).

Vega claims that this entire case turns on the hospital's assertion of the state's alleged parens patriae inter-

[9] See footnote 1 of this opinion.

est in protecting her infant. Vega argues that if her refusal of blood transfusions interfered with certain state interests, it should be the state itself, not a private hospital, that asserts the state's interests. The hospital responds that, because it was charged with Vega's care, and because it was required to choose between disregarding either Vega's wishes or her physicians' recommendations that she receive the transfusions, it had a direct stake in the outcome of the controversy and was a proper party to bring this action. We therefore rephrase the relevant question as follows: "Did the hospital have standing to challenge Vega's refusal of lifesaving blood transfusions?" Insofar as the hospital's claims are founded on its own interests, rather than those of the state, we agree with the hospital that it has standing to bring those claims, and we answer the rephrased certified question in the affirmative.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . *Ardmare Construction Co.* v. *Freedman,* 191 Conn. 497, 501, 467 A.2d 674 (1983)." (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education,* 226 Conn. 704, 717, 629 A.2d 333 (1993). Standing focuses on whether the party initiating the action is the proper party to request adjudication of the issues. *Nye* v. *Marcus,* 198 Conn. 138, 141, 502 A.2d 869 (1985). In general, a party does not have standing to raise rights belonging to another. *Third Taxing District* v. *Lyons,* 35 Conn. App. 795, 798, 647 A.2d 32, cert. denied, 231 Conn. 936, 650 A.2d 173 (1994). "[T]he concept of standing is a practical and functional one designed to ensure that only those parties with a substantial and legitimate interest can appeal an order." *Primerica* v. *Planning & Zoning Commission,* 211 Conn. 85, 93, 558 A.2d 646 (1989).

It is true, as Vega argues, that the state has never been a party to this action and that any assertion by the hospital of an interest belonging solely to the state raises a question of the hospital's standing to assert that interest.[10] The Florida Supreme Court, when faced

[10] We reject the suggestion in the concurring opinion that we invite the attorney general to participate in this appeal as an amicus curiae in order to decide the contours and weight of the state's interest in this dispute. We know of no precedent in our jurisprudence for determining the merits of a nonparty's interests based solely on that person's or entity's participation as an amicus curiae, particularly where that entity did not participate either in the trial court or in the appellate proceedings to date. The case that most closely approximates such a determination of a nonparty's interests based on that party's participation as amicus curiae is *Hilton* v. *New Haven*, 233 Conn. 701, 661 A.2d 973 (1995). In *Hilton*, we determined that the state does not have an obligation under the Connecticut constitution to provide shelter for its homeless citizens. We reached that conclusion, which had "significant ramifications for the state"; id., 723; despite the state's participation as amicus curiae rather than as a defendant, because the state had "fully participated in briefing the issues and at oral arguments . . . [and] the state was a party in the companion case of *Moore* v. *Ganim*, [233 Conn. 557, 660 A.2d 742 (1995)], which we determine[d] to be dispositive of the plaintiffs' constitutional claims in [*Hilton*]." *Hilton* v. *New Haven*, supra, 723–24. In effect, therefore, the state was a party in *Hilton* via its participation in *Moore*. Thus, the situation in *Hilton* is distinguishable from that proposed by the concurring opinion, namely, that we determine the state's interests in this case based solely on its participation as amicus curiae. Compare also *Singh* v. *Singh*, 213 Conn. 637, 641, 569 A.2d 1112 (1990) (where original parties to action assumed same position on appeal, state invited to appear as amicus curiae in order to present adversarial position); *In re Appeal of Dattilo*, 135 Conn. 512, 514, 66 A.2d 596 (1949) (attorney general, as amicus curiae, may not move to erase appeal).

Moreover, although the state had no notice of the trial court proceedings, the same cannot be said of the appellate proceedings. The fact that this court would be considering this case, and the issues arguably implicating a state's interest, were publicized in the Connecticut Law Journal on January 17, 1995, and have been public knowledge since then. See *Stamford Hospital* v. *Vega*, 231 Conn. 944, 653 A.2d 827 (1994). Nonetheless, the state took no steps, either to intervene as a party in order to assert its interest, or to participate as an amicus. Under these circumstances, we believe the more prudent policy to be to refrain from considering the state's interest, and to decide the dispute between the parties who are before us.

Furthermore, the state is not left without mechanisms, in future cases, to assert its interest if it wishes to do so. For example, it could notify all general hospitals in the state that it is prepared to participate, on short

with this precise issue, determined that the hospital's interests might not mirror the state's interests and that "a health care provider must not be forced into the awkward position of having to argue zealously against the wishes of its own patient. . . ." *In re Dubreuil,* 629 So. 2d 819, 823 (Fla. 1993). That court concluded, therefore, that "a health care provider wishing to override a patient's decision to refuse medical treatment must immediately provide notice to the [state]." Id., 824.

We conclude that a private health care facility may not assert the state's interests in opposing a patient's refusal of medical treatment, because to permit such a facility to do so would: (1) contravene the usual rule against vicarious third party standing; see *Third Taxing District* v. *Lyons,* supra, 35 Conn. App. 798; and (2) place the facility in an inherently conflicted position of opposing its patient's competently expressed desires. Nonetheless, three considerations lead us to conclude that the hospital has standing in its own right to invoke the judicial process in order to seek determinative guidance regarding its obligations in this difficult position.

First, as a provider of health care to the residents of Stamford and its surrounding communities, the hospital has an interest in ensuring that the integrity and ethical standards of the medical profession be maintained. Often, a decision such as Vega's "to refrain from treatment runs contrary to the training and beliefs of health professionals. Doctors, nurses, health technicians, and others are imbued with the idea of effecting cures—not

notice, in any future determinations similar to those in this case, and could request that, before any hospital adheres to the patient's wishes it notify the state in order to give the state an opportunity to instigate judicial proceedings at which the state will assert its interest. If that were done, we doubt that any such hospital, after appropriate legal advice, would simply ignore the state's request. We are not to be understood as encouraging any such action by the state. We note this possibility, without ruling out others, only to underscore the prudence of the course that we have taken in deciding this case between the parties.

of allowing a curable or arrestable disease to run its course. When confronted by a patient who opts out of all care or some form of treatment (e.g., blood transfusions), the health professional often reacts by dismissing the decision as unwise. Sometimes the doctor decides the judgment was reached during an emotionally overwrought state. Sometimes the doctor rejects the decision made by a patient who is so ill that, if not legally incompetent, he is incapable of making a determination." F. Rozovsky, Consent to Treatment (2d Ed. 1990) § 7.0, p. 438.

In this case, Vega had submitted herself to the care of the hospital, which was charged with providing the appropriate medical care for her and her baby. Although Vega's physicians did not question her competence to make a decision to refuse treatment, they firmly believed that Vega's refusal of blood transfusions imperiled her life. The hospital, in recommending blood transfusions for Vega, was attempting to save her life by employing a long-standing, fairly routine medical treatment, and was acting in accordance with the training of medical professionals and the expectations of the medical profession held by the citizenry in general.

Second, the hospital had a legitimate interest in receiving official guidance in resolving the wrenching ethical dilemma it faced: whether to practice medicine by trying to save a patient's life despite that patient's refusal to consent to treatment, or to practice medicine in accordance with the patient's wishes and likely watch the patient die, knowing nonetheless that it had the power to save her life. Thus, the hospital had conflicting interests, and in that respect was in the role, not of opposing its patient, but of a party seeking the court's guidance in determining its obligations under the circumstances. Hospitals have been advised that "[m]embers of sects that reject certain kinds of medical procedures consider refusal of consent issues to be of

substantial importance and can be expected to undertake litigation to obtain court vindication of their rights. In light of the sensitivity of this issue, it is advisable that hospitals and physicians seek the advice of legal counsel and/or instruction of the court when faced with a patient's refusal of treatment in a case where there is a serious threat to health." Hospital Law Manual, Attorney's Vol. II, Consent to Medical and Surgical Procedures § 9-1, p. 119 (1994). The hospital appropriately sought the guidance of the trial court in resolving the dilemma that it faced.

Third, the hospital also had a practical claim to standing in this case. Cases from other jurisdictions have recognized that a *state* may assert interests in opposition to those of a patient who is refusing medical treatment, or of a party who is refusing medical treatment on behalf of a patient. See, e.g., *In re Guardianship of Browning*, 568 So. 2d 4 (Fla. 1990); *In re L.H.R.*, 253 Ga. 439, 321 S.E.2d 716 (1984); *In re Karwath*, 199 N.W.2d 147 (Iowa 1972); *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Gardner*, 534 A.2d 947 (Me. 1987); *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976); *State Dept. of Human Services* v. *Northern*, 563 S.W.2d 197 (Tenn. App. 1978). Those cases, however, did not involve decisions of an emergency nature. It was practical in those cases, therefore, for the state to become involved under those circumstances.

Conferring standing only on the state and denying it to the hospital, in this case, however, would have had the practical effect of requiring the hospital to abandon its own legitimate interests identified previously. Furthermore, such action would have effectively insulated the patient's choice from any official scrutiny because, as the facts indicate here, it would have been extremely

difficult for the state to initiate judicial proceedings in time to do any good, and even if the state could have done so, it would likely have been unfamiliar both with the medical options available and with the facts and circumstances surrounding the patient's desires. The hospital was, as a practical matter, the best informed and most feasible candidate, under these circumstances, to set the judicial machinery in motion. For these reasons, we conclude that the hospital had standing to challenge Vega's refusal of blood transfusions.

## B

We now turn to the substantive issues raised in this appeal. Vega claims that the state's interest in the welfare of her child is not sufficiently compelling as to outweigh her interest in refusing blood transfusions. Accordingly, she maintains that the trial court's injunction, issued at the behest of the hospital, violated her common law right of self-determination, her federal constitutional right to bodily self-determination, her federal constitutional right to free exercise of religion,[11] and her state constitutional right of religious liberty.[12] Having determined that the hospital has standing to assert its own interests, rather than those of the state, we view Vega's claim as having four distinct aspects, and we therefore rephrase the relevant certified question as follows: "Did the trial court's issuance of an injunction permitting the hospital to perform blood transfusions on Vega violate her: (1) common law right of bodily self-determination; (2) federal constitutional right of bodily self-determination; (3) federal constitutional right of religious free exercise; and (4) state con-

---

[11] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[12] The constitution of Connecticut, article first, § 3, provides in relevant part: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state . . . ."

stitutional right of religious liberty?" We conclude that, under the circumstances of this case, the issuance of the injunction, followed by the administration of the blood transfusions, violated Vega's common law right of bodily self-determination. Following the principle that we "eschew unnecessary determinations of constitutional questions"; (internal quotation marks omitted) *DeBeradinis* v. *Zoning Commission*, 228 Conn. 187, 195, 635 A.2d 1220 (1994); we need *not*, therefore, consider Vega's constitutional claims.

In this connection, we first consider one aspect of the hospital's claim that arises out of the issues as phrased by Vega in the Appellate Court and as originally certified by us. That is, if Vega were to have died as a result of the hospital's acquiescence in her refusal to consent to a blood transfusion, she would have been abandoning her baby and, therefore, the hospital had a legitimate interest in protecting the welfare of an innocent third party who was also its patient—the baby—that outweighed Vega's interest in bodily self-determination. We conclude that, under the circumstances of this case, the hospital's legitimate interest in protecting its patients does not stretch that far.

Admittedly, the hospital was charged with the medical care of both Vega and her baby. Once the baby was born, however, Vega's decision to refuse a blood transfusion posed no risk to the baby's physical health.[13] Although the hospital's concern for the long-term welfare of the baby is certainly commendable, and although there may be some medical decisions that a hospital makes regarding newborn babies that are based upon its perception of the long-term health of the baby, whether Vega's child grows up with one, rather than two, par-

---

[13] Thus, we are not faced with, and do not decide, the question of whether, if Vega had begun to hemorrhage prior to the birth and a blood transfusion were necessary to safeguard the health or life of the baby, the hospital would have been justified in administering blood transfusions to Vega.

ents, or, for that matter, with no parent at all, was simply not an issue sufficiently within the scope of the hospital's legitimate interest in providing medical care to the baby to justify disregarding Vega's clearly expressed proscription against administering blood transfusions to her.

The conclusion that the hospital had no legitimate interest in disregarding Vega's wishes in order to protect the upbringing of her baby does not, however, end our inquiry. We must still decide between the competing claims of Vega and the hospital.

Vega's claim centers on her common law right of bodily self-determination. "The right to refuse medical treatment is a right rooted in this nation's fundamental legal tradition of self-determination." *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 701, 553 A.2d 596 (1989). That common law right and its roots in our legal tradition have a long and impressive pedigree. More than one century ago, the United States Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestioned authority of law." *Union Pacific Railway Co.* v. *Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891). In the context of a medical malpractice action based on the doctrine of informed consent, we stated: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Schmeltz* v. *Tracy*, 119 Conn. 492, 495, 177 A. 520 (1935); see also *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 288–89, 465 A.2d 294 (1983). In yet another closely related context, the United States Supreme Court has

recently reiterated that the "notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment"; *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990); and that "[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." Id., 270; see also id., 277 ("the common law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment").

Vega's refusal of blood transfusions was clearly in keeping with the deeply rooted common law right of bodily self-determination. The only question, therefore, is whether the hospital and the trial court were obliged to respect Vega's decision to refuse blood transfusions, even though her decision would likely have led to her death.

The hospital's interests are in preserving the life of its patient and protecting the ethical integrity of the medical profession. Those interests are intertwined. Hospitals exist, and doctors are trained, in order to provide care and treatment for sick and dying patients. "The preservation of life is not only a laudable goal for . . . the physicians and for the health care facilities to aspire to, it is a compelling one." *St. Mary's Hospital* v. *Ramsey*, 465 So. 2d 666, 668 (Fla. App. 1985). Vega's life could be saved by the administration of treatment that most people would consider routine. The hospital and its doctors quite understandably did not wish to stand by and see a healthy young woman die.

Although the hospital's interests are sufficient to confer standing on it in this case, they are not sufficient to take priority over Vega's common law right to bodily integrity, even when the assertion of that right threatens her own life. "The choice between life and death is a deeply personal decision of obvious and overwhelming

finality." *Cruzan* v. *Director, Missouri Dept. of Health,* supra, 497 U.S. 281. The refusal to subject oneself to certain forms of medical treatment, or to any treatment whatsoever, may often lead to more serious health consequences and, ultimately, to death. If the common law right to refuse medical treatment, based on the doctrine of informed consent, is entitled to respect, that respect must be accorded when the consequences are likely to be the most serious—in matters of life and death.

The hospital, however, had no common law right or obligation to thrust unwanted medical care on a patient who, having been sufficiently informed of the consequences, competently and clearly declined that care. As long as Vega was sufficiently informed of the consequences of her decision, was competent to make such a decision, and freely chose to refuse the transfusion—none of which is disputed in this record—both the hospital and the trial court were required to respect her choice. The hospital's interests were sufficiently protected by Vega's informed choice, and neither it nor the trial court was entitled to override that choice.

Thus, under the facts of this case, Vega's common law right of bodily self-determination was entitled to respect and protection. The trial court, therefore, improperly issued an injunction that permitted the hospital to administer blood transfusions to Vega.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to render judgment for Vega.

In this opinion PETERS, C. J., and BERDON and KATZ, Js., concurred.

PALMER, J., concurring. I agree with the majority opinion, as far as it goes. In my view, however, we

should take the opportunity presented by this case to address two important issues not reached by the majority, namely, whether the state has a legally cognizable interest in preserving the life of a patient who rejects routine, lifesaving medical treatment and, if so, whether the patient's right of bodily self-determination nevertheless outweighs the state's interest in saving the patient's life.[1]

I agree with the majority that although the hospital has standing in its own right to invoke the court's jurisdiction, the hospital cannot properly raise whatever interest the state itself may have in seeking to compel an unwilling patient to undergo a routine, lifesaving medical procedure. It seems to me, however, that the state's interest in preserving the life of an otherwise healthy patient who refuses to submit to a lifesaving procedure may well be greater than a health care provider's interest in administering such treatment; indeed, the trial court relied *solely on the state's interest* in granting the hospital's request for an injunction authorizing it to administer a blood transfusion to Vega.[2] In view of the state's apparent interest, I would ask the attorney general to appear and to participate in this appeal as an amicus curiae on behalf of the state of Connecticut.[3]

---

[1] As the majority notes, the questions that we originally certified would have required us to reach these issues; see footnote 1 of the majority opinion; which have never been resolved by this court. See footnote 4 of the majority opinion.

[2] "Four compelling state interests appear to have been commonly identified by courts and commentators in such decisions: (1) the preservation of life; (2) the prevention of suicide; (3) the protection of innocent third parties; and (4) the maintenance of the ethical integrity of the medical profession." *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 716, 553 A.2d 596 (1989) (*Healey, J.*, concurring). The trial court concluded that the state's interests in preserving life and protecting innocent third parties outweighed Vega's interest in refusing the blood transfusions.

[3] It is not uncommon for this court to request the submission of amicus briefs, and we have previously asked the state to do so. See, e.g., *Associated*

Because nothing that we decide in this case can change the fact that Vega has already undergone an involuntary blood transfusion, the case is technically moot; we have jurisdiction over this appeal only because the issues presented herein are both "capable of repetition, yet evading review" and of public importance. Thus, we granted Vega's petition for certification to provide guidance to health care providers, trial judges and others who may be required to decide, invariably in urgent circumstances, whether routine, lifesaving medical treatment may be administered to a patient who does not want it. By declining the opportunity to address the issue of the state's interest in such a case, we leave unanswered—without good cause, in my judgment—a question that is central to the fundamental issue presented by this appeal and one that was raised both in the trial court and on appeal.

Practical considerations militate strongly in favor of addressing the issue of the state's interest that the majority chooses to reserve for another day. In light of today's decision, health care providers are entitled to presume that they are obligated to honor the wishes of a competent, adult patient who, with a full understanding of the consequences, chooses to reject a routine, lifesaving medical procedure. In such circumstances, if the hospital is not apt to perceive a need for court authorization or intervention before assenting to the patient's wishes, the state is unlikely to have the opportunity to assert its interest in saving the patient's life before it is too late for the state to do so. Moreover, if the Superior Court were to be called upon to consider the matter, there is no reason to assume that the state would be afforded timely notice of a hearing, especially if, as here, emergency circumstances necessitate an immediate decision before all interested parties are

available. And if the state were to receive timely notice and promptly sought to intervene, the trial court would be required to decide, under severe time constraints and without any guidance from this court, first, whether the state should be granted party status, and second, whether the state's interest in preserving the patient's life may be found to outweigh the patient's interest in bodily self-determination.[4]

Because there is strong reason to address the issue of the state's interest and no sound contrary reason, I would do so after consideration of the state's position and any response thereto by the parties to this case. Such a course would enable us to provide much greater guidance to those who may be called upon in the future to decide the extraordinary, and wrenching, questions raised by this case.

---

[1] The majority's assertion to the contrary notwithstanding, jurisprudential considerations counsel our consideration of the issue of the state's interest in preserving the life of a person who rejects routine, lifesaving medical treatment. In concluding that we should not invite the state to appear as amicus curiae, the majority relies exclusively on the fact that we have not previously adjudicated "the merits of a nonparty's interests based solely on that person's or entity's participation as an amicus curiae." See footnote 10 of the majority opinion. The majority's position elevates form over substance. Although I can conceive of no reason why either the hospital, Vega or the state would object to the state's participation in this appeal as amicus curiae—and the majority has identified none—the parties and the state would be free to raise any such objection for our consideration. Moreover, the facts are not in dispute, the question of the state's interest is an important one, and the public interest would be better served by deciding the issue. I see no reason why we should not seek to do so.

Finally, there is no merit to postponing consideration of the question until the state is able to participate as a party in a similar future case. As previously indicated, the question of the state's interest is likely to arise in emergency circumstances not conducive to deliberative decision-making. In my judgment, therefore, it would be far wiser for us to address the issue now so that we may provide guidance to those who, in the future, will be confronted with a case like this one.