El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
La controversia planteada ante este Tribunal en el caso de autos nos brinda la oportunidad de expresarnos, por primera vez, sobre un asunto de particular importancia *900 para nuestra sociedad. Se trata de la validez de una declaración previa de voluntad suscrita por una persona que, por sus creencias religiosas, decidió rechazar transfusiones de sangre en cualquier circunstancia —y sin sujeción a condición de salud alguna— aun cuando ello implicara peligro mortal para su vida o su salud. En esencia, debemos evaluar si es ejecutable un documento de este tipo aun en circunstancias no contempladas específicamente por la ley.
Tras un cuidadoso y concienzudo análisis del caso ante nuestra consideración, así como del derecho aplicable, concluimos que tanto la Constitución del Estado Libre Asociado de Puerto Rico como la Constitución de Estados Uni-dos protegen el derecho de las personas a rechazar tratamiento médico sin sujeción a condición de salud alguna y aun cuando ello pudiera ocasionar su muerte. Por consiguiente, resolvemos que el Art. 6 de la Ley de Declaración Previa de Voluntad sobre Tratamiento Médico en Caso de Sufrir una Condición de Salud Terminal o de Estado Vegetativo Persistente, Ley Núm. 160 de 17 de noviembre de 2001 (24 L.P.R.A. see. 3651 et seq.) (Ley Núm. 160), es inconstitucional en tanto en cuanto impone un límite a la voluntad válidamente expresada de un ciudadano y sujeta su eficacia solamente a circunstancias en que exista un diagnóstico particular de una de las dos condiciones allí dispuestas. Tal limitación infringe el derecho constitucional de un individuo de tomar decisiones respecto a su tratamiento médico.
No obstante, reconocemos que el derecho de rechazar tratamiento médico no es absoluto y podría ser limitado ante la presencia de ciertos intereses del Estado. En este caso, sin embargo, no quedó probado ningún interés estatal que sobrepasara el derecho del paciente de rechazar tratamiento médico. Por lo tanto, revocamos el dictamen recurrido.
*901 I
En abril de 2004 el Sr. Víctor Hernández Laboy, quien era mayor de edad, estaba en pleno disfrute de sus facultades mentales y era feligrés de la Congregación de los Testigos de Jehová en Humacao, otorgó ante un notario un documento de declaración previa de voluntad(1) y designación de mandatario. En dicho documento, y conforme a sus convicciones religiosas,(2) rechazó de forma absoluta e inequívoca recibir, en toda circunstancia, tanto sangre de otra persona como sangre propia almacenada, sin importar su estado de salud ni las consecuencias que tal rechazo pudiera acarrear. Específicamente, éste hizo constar en su declaración:
Yo, Víctor Hernández Laboy, mayor de edad y en pleno uso de mis facultades mentales, firmo por voluntad propia este documento. ... Soy testigo de Jehová. Basándome en mis firmes convicciones religiosas (véase, Hechos 15:28,29) y mi deseo de evitar numerosos riesgos y complicaciones vinculados con el uso de la sangre, rechazo absoluta, inequívoca y resueltamente sángre alogénica (sangre de otra persona) y sangre autóloga almacenada (mi propia sangre almacenada) en toda circunstancia, sin importar cuál sea mi estado de salud. Esto significa que no se me administre ni sangre total ni ninguno de sus componentes principales (glóbulos rojos, glóbulos blancos, plaquetas o plasma sanguíneo), sean cuales sean las consecuencias. No acepto sangre aun cuando el personal médico (médicos, enfermeras, etc.) crea que sólo la transfusión sanguínea preservará mi vida o mi salud. También rehúso do *902 nar sangre con anterioridad a fin de que se almacene y posteriormente se me transfunda o se le transfunda a otra persona. Apéndice, pág. 48.
No obstante, hizo constar expresamente que aceptaba y solicitaba tratamiento médico alternativo sin sangre. El señor Hernández Laboy también expresó en el referido documento su deseo de que se respetara su voluntad y especificó que no autorizaba a nadie, ni siquiera a sus familiares, a que pasaran por alto o anularan su rechazo a la sangre. Del mismo modo, exoneró de toda responsabilidad a los médicos, anestesiólogos y al hospital y su personal por cualquier daño que resultara de su negativa a aceptar sangre. Además, el señor Hernández Laboy designó como mandatario al Sr. Roberto Tirado Flecha para que tomara cualquier decisión sobre la aceptación o el rechazo de tratamiento médico en caso de que no pudiera comunicarse por sí mismo, y nombró un mandatario sustituto.
Posteriormente, en junio de 2005, el señor Hernández Laboy estuvo involucrado en un accidente automovilístico en el que sufrió graves lesiones. Luego de ser llevado inicialmente al Hospital Ryder de Humacao, fue trasladado a la Unidad de Trauma Intensivo del Centro Médico de San Juan. Tras el ingreso del señor Hernández Laboy a dicho hospital, su esposa, la Sra. Luz E. Lozada Tirado —quien no es miembro de la Congregación de los Testigos de Jehová— acudió al Tribunal de Primera Instancia, Sala Municipal de Humacao, y solicitó que se ordenara al hospital realizar una transfusión de sangre a su cónyuge. El tribunal accedió a la solicitud de la señora Lozada Tirado y emitió una orden ex parte a esos fines.
No obstante, el señor Tirado Flecha acudió al Centro Médico y se opuso, en nombre del señor Hernández Laboy, a que se le administrara sangre. A tales efectos, presentó el documento en el cual se expresaban los deseos del paciente y se le designaba como mandatario. El Centro Médico de *903 cidió respetar la voluntad del señor Hernández Laboy e hizo caso omiso a la orden emitida por la Sala Municipal de Humacao.
En vista de ello, la señora Lozada Tirado compareció ante el Tribunal de Primera Instancia, Sala Superior de San Juan, por sí y en representación de su hijo menor de edad, y presentó una petición urgente de una orden para que se realizara la transfusión de sangre al señor Hernandez Laboy.(3) En dicha solicitud expuso que el hospital se negaba a hacer la transfusión debido a las creencias religiosas del paciente. Indicó que la transfusión era necesaria para evitar su muerte, y adujo que el tribunal debía emitir la orden para proteger el bienestar del menor. Para sustentar su pedido, la señora Lozada Tirado alegó que se desempeñaba como ayudante de cocina en un centro del programa Head Start y su sueldo no era suficiente para cubrir las necesidades del hogar, por lo que argumentó que los ingresos del señor Hernández Laboy eran indispensables para el sustento del hogar y del niño menor de edad.
El foro de instancia celebró una vista a la que comparecieron la señora Lozada Tirado y sus hijas por derecho propio.(4) Luego de escuchar sus testimonios, el tribunal accedió a la solicitud presentada y ordenó a la Unidad de Trauma Intensivo del Centro Médico a transfundir sangre o dializar al señor Hernández Laboy. En su orden, el tribunal indicó que no se citó al señor Hernández Laboy por éste encontrarse inconsciente y en peligro de muerte. Cabe resaltar que el tribunal tampoco citó ni escuchó al señor Ti *904 rado Flecha como mandatario del señor Hernández Laboy ni a su médico.(5)
Al día siguiente, se celebró otra vista a la cual compareció la señora Lozada Tirado —esta vez acompañada de un abogado— así como el señor Tirado Flecha y la Administración de Servicios Médicos de Puerto Rico (ASEM).(6) En la referida vista se presentó el documento suscrito por el señor Hernández Laboy, en el cual designó al señor Tirado Flecha como su mandatario. La señora Lozada Tirado impugnó dicho documento porque, según ésta, en la declaración jurada no se hacía constar el número del medio supletorio de identificación utilizado. No obstante, el tribunal sostuvo su validez y, por ende, la designación de mandatario realizada por el señor Hernández Laboy. En su argumentación ante el foro primario, la representación legal del señor Tirado Flecha sostuvo que la resolución en la que se ordenó la transfusión de sangre constituía una violación de los derechos de libertad de culto e intimidad del señor Hernández Laboy. Por su parte, la señora Lozada Tirado reiteró su argumento de que mediaban circunstancias apremiantes que justificaban la intervención judicial.
Así las cosas, el tribunal emitió una resolución en la que reafirmó su orden anterior. Según el foro de instancia, la señora Lozada Tirado era una persona de “escasos recursos económicos” y de una “capacidad intelectual baja”, lo que llevó al tribunal a concluir que ella sola no podía hacerse cargo de su hijo menor de edad. El tribunal consideró, además, que el menor podría afectarse emocionalmente con la *905 pérdida de su padre adoptivo, luego de haber perdido a su padre biológico. Ante tales circunstancias, el tribunal entendió que existía un interés apremiante del Estado para obligar al señor Hernández Laboy a recibir sangre y a ser dializado.(7) Conforme a lo ordenado, el señor Hernández Laboy recibió la transfusión de sangre, pero a los pocos días falleció.
Inconformes con el dictamen emitido por el Tribunal de Primera Instancia, el señor Tirado Flecha y la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc. (Congregación de los Testigos de Jehová) recurrieron ante el Tribunal de Apelaciones. En síntesis, adujeron que el tribunal de instancia erró al reconocerle autoridad a la señora Lozada Tirado para invocar un interés apremiante del Estado y justificar así la solicitud de transfusión de sangre a su esposo. Además, argumentaron que el foro primario erró al no respetar la voluntad del señor Hernández Laboy —expresada bajo juramento— y al no celebrar una vista con todas las garantías del debido proceso de ley para resolver la controversia en conformidad con los derechos constitucionales de las partes.
El Tribunal de Apelaciones desestimó el recurso de certiorari presentado por el señor Tirado Flecha y la Congregación de los Testigos de Jehová, por entender que carecían de legitimación activa para solicitar la revocación del dictamen emitido por el foro primario. Según el tribunal apelativo intermedio, para que una declaración de voluntad de este tipo sea ejecutable, la citada Ley Núm. 160 exige que el declarante haya sido diagnosticado con una condición de salud terminal o que se encuentre en un estado vegetativo persistente. Debido a que el señor Tirado Flecha no presentó evidencia de tal diagnóstico durante la vista celebrada en el tribunal de instancia, el foro apelativo entendió *906 que no podía actuar como mandatario del señor Hernández Laboy, ya que la declaración de voluntad en que se hizo su designación no era ejecutable. Por ende, concluyó que no tenía legitimación activa para litigar el presente caso ante los foros judiciales. En cuanto a la Congregación de los Testigos de Jehová, el tribunal apelativo resolvió que como ésta no fue parte en los procedimientos llevados a cabo en el tribunal de instancia, estaba impedida de esgrimir sus planteamientos por primera vez ante el foro apelativo. De esta forma, determinó que la Congregación tampoco tenía legitimación activa para impugnar la orden emitida por el foro de instancia en la que se ordenó la transfusión de sangre al señor Hernández Laboy.
En vista de tal determinación, el señor Tirado Flecha y la Congregación de los Testigos de Jehová acuden ante nos y, en esencia, aducen que erró el Tribunal de Apelaciones al concluir que no poseen legitimación activa para impugnar la resolución del foro primario. Según los peticionarios, la interpretación que hizo el foro apelativo de la Ley Núm. 160 es incompatible con los derechos de intimidad, dignidad personal, autonomía personal y libertad de culto reconocidos en la Constitución de Puerto Rico y en la jurisprudencia de este Tribunal.
Los peticionarios alegan, además, que en la declaración de voluntad otorgada por el señor Hernández Laboy éste designó al señor Tirado Flecha para que actuara como su mandatario desde el momento en que se hallara incapacitado para tomar sus propias decisiones sobre tratamiento médico. No obstante, según sus argumentos, la interpretación de la Ley Núm. 160 realizada por el foro apelativo tiene el efecto de privar al paciente de contar con alguien que vele por que se cumpla su voluntad de no recibir sangre, hasta que se le diagnostique una enfermedad terminal o se determine que está en un estado vegetativo persistente. Es decir, los peticionarios aducen que la interpretación del Tribunal de Apelaciones le niega a todo pa *907 cíente el derecho de intimidad y autonomía corporal durante períodos de incapacidad temporal, lo que según éstos derrotaría el propósito de la declaración previa de voluntad.
Por su parte, la Congregación de los Testigos de Jehová alega que no participó de los procedimientos en el tribunal de instancia porque fueron de jurisdicción voluntaria y las vistas se celebraron de manera ex parte. La Congregación entiende que ello no debe ser impedimento para que se le reconozca interés y legitimación activa para cuestionar la determinación de los tribunales de permitir la transfusión de sangre a uno de sus feligreses, a pesar de su rechazo expreso a dicho tratamiento médico. Según la Congregación de los Testigos de Jehová, el rechazo a una transfusión de sangre en cualquier circunstancia es una doctrina fundamental de sus creencias religiosas. Por lo tanto, alega tener legitimación activa para impugnar la acción tomada por los tribunales en el caso de autos y, de esta forma, asegurarse que la voluntad de sus feligreses será respetada de acuerdo con los derechos constitucionales antes mencionados y los propósitos de la propia Ley Núm. 160.
Examinado el recurso, decidimos expedir el auto de certiorari. La señora Lozada Tirado y sus hijas no presentaron alegato alguno, por lo que procedemos a resolver la controversia ante nuestra consideración sin el beneficio de su comparecencia.
II
Como cuestión de umbral, dado que el señor Hernández Laboy falleció, debemos resolver si la controversia ante nuestra consideración se ha tornado académica.
 Sabido es que la jurisdicción de los tribunales está sujeta a que los casos sean justiciables, ya que su función es adjudicar controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito *908 sea obtener un remedio que tenga un efecto sobre la relación jurídica. E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958). Así, pues, los contornos del concepto de justiciabilidad se han delineado para establecer ciertas doctrinas que hacen viable la intervención oportuna de los tribunales, entre ellas la de academicidad. P.N.P. v. Carrasquillo, 166 D.P.R. 70, 74 (2005); Crespo v. Cintrón, 159 D.P.R. 290, 298 (2003); Noriega v. Hernández Colón, 135 D.P.R. 406, 421—422 (1994).
Sobre el particular, hemos resuelto que un caso es académico cuando los cambios fácticos o procesales ocurridos durante su trámite convierten la controversia en una ficticia, de modo tal que el fallo que emita el tribunal no tendría efectos prácticos por tratarse de un asunto inexistente. San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640 (2008); P.P.D. v. Gobernador I, 139 D.P.R. 643, 675 (1995).
No obstante, hemos reconocido ciertas excepciones a la doctrina de academicidad que permiten la intervención de los tribunales aun cuando el asunto aparente haberse tornado académico. Específicamente, los tribunales podrán atender el caso, a manera de excepción, cuando se plantea una cuestión recurrente y capaz de evadir la revisión judicial; cuando el demandado ha modificado la situación de hechos, pero el cambio no aparenta ser permanente, y cuando algunos aspectos de la controversia se han tornado académicos pero persisten importantes efectos colaterales. Angueira v. J.L.B.P., 150 D.P.R. 10, 19 (2000); Asoc. de Periodistas v. González, 127 D.P.R. 704, 719—720 (1991).
Para aplicar la excepción de cuestión recurrente se requiere que se tomen en consideración tres factores particulares: la probabilidad de la recurrencia, la identidad entre las partes involucradas y la probabilidad de que el asunto sea capaz de evadir la revisión judicial. Angueira *909 v. J.L.B.P., supra. Véase, además, J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs. 186-188. No es necesario, sin embargo, que exista identidad de partes para aplicar esta excepción cuando se trata de casos que requieren dilucidar derechos constitucionales de la más alta jerarquía. P.N.P. v. Carrasquillo, supra, pág. 77.
En el caso de autos, la controversia involucra los deseos de un paciente de rechazar tratamiento médico por razón de sus creencias religiosas, así como la validez del documento suscrito por éste para hacer constar tal rechazo y designar a una persona que vele por que se cumpla lo allí dispuesto. Ciertamente, la muerte del señor Hernández Laboy aparentaría haber tomado el caso en académico, ya que nuestra decisión no tendrá efectos prácticos sobre él. No obstante, consideramos que nuestra intervención en este caso está justificada, a manera de excepción, por tratarse de una cuestión recurrente capaz de evadir la revisión judicial.
El asunto planteado ante nuestra consideración es susceptible de repetirse, ya que las declaraciones previas de voluntad son cada vez más comunes y los adelantos médicos han dado lugar a múltiples controversias relacionadas con el derecho de un paciente a rechazar tratamiento médico. Además, se trata de controversias que son capaces de evadir la revisión judicial, pues involucran tratamiento médico de personas cuyo estado de salud es sumamente delicado. Por ello, —como norma general— estos casos se tornan académicos, ya que al llegar ante la consideración de los foros judiciales apelativos se ha provisto el tratamiento en cuestión o el paciente ha fallecido. También puede haberse realizado la transfusión de sangre rechazada por el paciente y, de todos modos, éste haber fallecido, como ocurrió en el caso de autos. En vista de ello, y conscientes de que se trata de un caso que nos requiere pasar *910 juicio sobre derechos constitucionales de gran trascendencia, concluimos que nos encontramos ante una excepción a la doctrina de academicidad que nos permite atender la presente controversia.
Aclarado este asunto, pasemos a examinar el derecho aplicable a la controversia ante nuestra consideración.
III
A. La Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico consagra el principio cardinal de la inviolabilidad de la dignidad del ser humano. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. A base de ello, reconoce como derechos fundamentales la intimidad y la protección contra ataques abusivos a la honra, la reputación y la vida privada o familiar. Art. II, Secs. 1 y 8, Const. E.L.A., supra. Estos derechos tienen especial preeminencia en nuestro esquema constitucional. Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 201 (1998). A la luz de las referidas disposiciones constitucionales, hemos resuelto que el Estado tiene una función dual para proteger los derechos allí contenidos: abstenerse de actuar de manera tal que se viole el ámbito de autonomía e intimidad individual y actuar afirmativamente en beneficio del individuo. Id.
En nuestra jurisdicción, el derecho de intimidad impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982). Por su importancia, este derecho opera ex proprio vigore y sin la necesidad de que concurra el requisito de acción estatal para invocarlo frente a personas particulares. Soc. de Gananciales v. Royal Bank de P.R., supra, pág. 201. Además, hemos resuelto que el derecho de intimidad se lesiona, entre otras instancias, cuando se limita la facultad de un individuo de *911 tomar decisiones personales, familiares o íntimas. íd., pág. 202.
Cónsono con lo anterior, hemos reconocido el derecho de todo paciente de tomar decisiones respecto a la intervención médica a la que habrá de someterse. Sepúlveda de Arrieta v. Barreto, 137 D.P.R. 735, 742 (1994). Ello incluye su derecho de consentir o rechazar tratamiento médico, luego de que su médico le haya provisto la información necesaria para tomar una decisión de esa naturaleza. Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 663-666 (1988). Esta doctrina, conocida como la doctrina del consentimiento informado, se basa en el derecho fundamental que consagra la inviolabilidad del cuerpo humano como un derecho inalienable de las personas. Santiago Otero v. Méndez, 135 D.P.R. 540, 557 esc. 24 (1994); Montes v. Fondo del Seguro del Estado, 87 D.P.R. 199, 203-204 (1963).
A su vez, la doctrina del consentimiento informado impone al profesional de la salud el deber de informar a su paciente todo lo relacionado con la naturaleza y los riesgos de un tratamiento médico, de manera que éste pueda tomar una decisión inteligente e informada. Rodríguez Crespo v. Hernández, supra, pág. 664. De hecho, basado en el derecho de intimidad y conforme a la referida doctrina del consentimiento informado, hemos resuelto que una intervención médica realizada sin contar con el consentimiento previo del paciente es un acto torticero e ilegal. Véanse: Santiago Otero v. Méndez, supra; Montes v. Fondo del Seguro del Estado, supra, pág. 203; Rojas v. Maldonado, 68 D.P.R. 818 (1948).
Por su parte, en el ámbito federal y en el derecho común anglosajón, el derecho de todo paciente a rechazar tratamiento médico, como corolario de la doctrina de consentimiento informado, ha sido reconocido desde principios del siglo XX. Véase, e.g., Schloendorff v. Society of New York Hospital, 105 N.E. 92, 93 (N.Y. 1914). Cónsono con *912 ello, en el normativo caso Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 270 (1990), el Tribunal Supremo de Estados Unidos resolvió: “El corolario lógico de la doctrina de consentimiento informado es que el paciente generalmente posee el derecho de no consentir, es decir, de rechazar tratamiento.” (Traducción nuestra.) Más importante aún, en dicho caso el máximo foro judicial federal partió de la premisa de que la Constitución de Estados Unidos garantiza —como parte del interés libertario protegido por el debido proceso de ley, consagrado en la Decimocuarta Enmienda— el derecho de rechazar tratamiento médico, incluso cuando dicho tratamiento sea necesario para salvar la vida del paciente. Id., págs. 278-279.
En términos similares se expresó dicho tribunal en Washington v. Glucksberg, 521 U.S. 702, 720 (1997), al reiterar que: “También hemos presumido, y sugerido fuertemente, que la cláusula del debido proceso protege el derecho tradicional de rechazar tratamiento médico no deseado para salvar la vida [del paciente].” (Traducción nuestra.) Esta protección constitucional también se puede inferir de decisiones previas de dicho foro. Cruzan v. Director, Missouri Dept. of Health, supra, pág. 278. Se trata, pues, de un derecho derivado de la doctrina de consentimiento informado del derecho común anglosajón y que, a su vez, está protegido por la Constitución de Estados Unidos.
En Cruzan v. Director, Missouri Dept. of Health, supra, el Tribunal Supremo de Estados Unidos abordó el caso de una paciente incompetente que se encontraba en estado vegetativo tras haber sufrido un accidente automovilístico. Luego de varios años, a la luz de opiniones médicas que aseguraban que la condición de la mujer era permanente e irreversible y que no había esperanza de que recobrara las facultades cognoscitivas, sus padres solicitaron una orden al tribunal para retirar el tratamiento de nutrición e hidratación que la mantenía con vida. El tribunal estatal concedió la orden. Esta determinación fue revocada por el *913 Tribunal Supremo de Missouri por entender que no existía evidencia clara y convincente, según lo requería la ley de Missouri, de que la voluntad de la paciente hubiese sido rechazar dicho tratamiento.
Ante la decisión adversa del Tribunal Supremo estatal, los padres de la joven acudieron al máximo foro federal, el cual resolvió que en estos casos debe prevalecer la voluntad del paciente, pero reconoció como parte de su análisis que en ocasiones la única forma de hacer valer dicha voluntad es por medio de otra persona designada para tales propósitos. Cruzan v. Director, Missouri Dept. of Health, supra, págs. 271-274. En ese sentido, el Estado puede imponer ciertas salvaguardas procesales para garantizar que la acción del subrogado realmente responda a la voluntad expresada por el paciente mientras éste gozaba de capacidad para actuar. Id., págs. 280-287. De esta forma, en Cruzan el Tribunal Supremo de Estados Unidos validó el requisito de evidencia clara y convincente impuesto por el estado de Missouri para determinar cuál hubiese sido la voluntad del paciente incompetente en ausencia de un testamento vital. Id.
Es menester resaltar que en dicho caso la paciente no había suscrito un testamento vital ni una declaración previa de voluntad. Por lo tanto, según el propio Tribunal Supremo Federal, el derecho que ésta pudiera tener a rechazar tratamiento médico debía ser ejercido por algún subrogado. Ante esa circunstancia, el propósito del estándar de prueba adoptado por el estado de Missouri era, justamente, garantizar que la decisión de esos subrogados —en ese caso los familiares— fuese cónsona con lo que hubiera decidido la paciente de haber estado consciente. Cruzan v. Director, Missouri Dept. of Health, supra.(8)
Sobre el particular, en Cruzan el Tribunal Supremo Fe *914 deral citó con aprobación los casos Matter of Quinlan, 355 A.2d 647 (N.J.1976), y Superintendent of Belchertown v. Saikewicz, 370 N.E.2d 417 (Mass. 1977), resueltos por el Tribunal Supremo de New Jersey y el Tribunal Supremo Judicial de Massachusetts, respectivamente. En dichos casos, ambos tribunales adoptaron un estándar de “juicio subrogado” 0substituted judgment) mediante el cual el foro judicial debía determinar cuál hubiese sido la voluntad de una persona incompetente en cuanto al tratamiento médico. Así, los tribunales intentan situarse en la posición de la. persona afectada para tomar una decisión que, sin pasar juicio sobre ella, es la que hubiese tomado el paciente de haber estado competente. Superintendent of Belchertown v. Saikewicz, supra, pág. 431; In re Care and Protection of Sharlene, 840 N.E. 2d 918, 927 (Mass. 2006).
B. Por otra parte, tanto nuestra Constitución como la Constitución de Estados Unidos consagran el derecho de libertad de culto, el cual garantiza la práctica de creencias religiosas, ya sea de manera individual o colectiva, libre de prohibiciones impuestas por el Estado. Art. II, Sec. 3, Const. E.L.A., supra-, Enmda. 1, Const. EE.UU., L.P.R.A., Tomo 1; Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R. 150, 160 (1994).(9)
Para determinar si es válida una actuación del Estado que tenga un efecto sobre una práctica religiosa es necesario evaluar la acción estatal, el interés del Estado que la motiva y el efecto que tiene sobre determinada práctica religiosa. En vista de ello, el Tribunal Supremo de Estados Unidos ha resuelto que “una ley que sea neutral y de aplicabilidad general no tiene que estar justificada por un *915 interés gubernamental apremiante aun cuando tenga el efecto incidental de imponer una carga sobre una práctica religiosa particular”. (Traducción nuestra.) Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 531 (1993).(10) Véanse, además: Employment Div. Ore. Dept. of Human Res. v. Smith, 494 U.S. 872 (1990); Mercado, Quilichini v. U.C.P.R., 143 D.P.R. 610 (1997); Asoc. Academias y Col. Cristianos v. E.L.A., supra; Díaz v. Colegio Nuestra Sra. del Pilar, 123 D.P.R. 765 (1989).
No obstante, ante reclamos de que una norma neutral y de aplicabilidad general afecta una práctica religiosa particular, aun cuando la ley sea constitucional de su faz, podría ser necesario que el Estado realice alguna concesión para acomodar la práctica afectada. Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418 (2006). Véase, además, Alvarez González, op. cit., pág. 1193.
C. Así, pues, tanto nuestra Constitución como la de Estados Unidos cobijan, amparados en diversas protecciones, el derecho de las personas de no consentir o rechazar tratamiento médico. Ahora bien, como todo derecho constitucional, el derecho de rechazar tratamiento médico *916 no es absoluto. En ese sentido, en Cruzan v. Director, Missouri Dept. of Health, supra, el Tribunal Supremo Federal dispuso que, al enfrentarse con el rechazo de un paciente a cierto tratamiento médico, los tribunales deben hacer un balance entre ese derecho y ciertos intereses del Estado. En particular, en el referido precedente se reconoció, a base de lo decidido por la jurisprudencia estatal, que el Estado puede tener interés en la preservación de la vida, la prevención del suicidio,(11) la protección de terceros inocentes y en mantener la integridad de la profesión médica. Cruzan, supra, pág. 271.
Aun cuando este Tribunal no ha tenido la oportunidad de expresarse sobre esta materia, existe una extensa jurisprudencia desarrollada por los estados acorde con lo resuelto por el Tribunal Supremo de Estados Unidos en Cruzan v. Director, Missouri Dept. of Health, supra. Dicha jurisprudencia resulta altamente ilustrativa y útil para resolver la controversia ante nuestra consideración, pues buena parte de ella involucra a pacientes que son Testigos de Jehová y que se negaron a recibir sangre por sus convicciones religiosas. Véanse, e.g.: Stamford Hosp. v. Vega, 674 A.2d 821 (Conn. 1996); Matter of Dubreuil, 629 So.2d 819 (Fla. 1993); Norwood Hosp. v. Muñoz, 564 N.E.2d 1017 (Mass. 1990); Fosmire v. Nicoleau, 551 N.Y.S.2d 876, 879 (Ct. App. 1990).(12) En estos casos, los tribunales han realizado un balance de intereses entre los derechos constitucionales del paciente y los intereses del Estado reconocidos en Cruzan y otra jurisprudencia.
Específicamente, respecto al interés de prevenir el suicidio, se ha resuelto que el rechazo de cierto tratamiento *917 médico por parte de un paciente no puede ser considerado como un intento de suicidio. Norwood Hosp. v. Muñoz, supra, pág. 1022; Fosmire v. Nicoleau, supra, pág. 881; Matter of Conroy, 486 A.2d 1209, 1224 (N.J.1985). La razón es que, en estos casos, al igual que en el caso de autos, el paciente sólo rechaza cierto tipo de tratamiento médico por razones religiosas o de otra índole, pero generalmente está dispuesto a considerar y aceptar otras opciones. Es decir, el objetivo del paciente que rechaza algún tipo de tratamiento médico en estos casos no es privarse de la vida, sino actuar conforme a lo postulado por su fe religiosa.
De igual forma, los tribunales han resuelto que si bien el Estado puede tener un interés en la preservación de la vida, sobre todo en un caso en el que la condición del paciente sea curable, dicho interés disminuye cuando quien toma la decisión de rechazar el tratamiento médico es el propio paciente. Ello es así, ya que no se trata de proteger la vida de un tercero, sino la del propio paciente que ha decidido no someterse a la intervención médica, amparado en su derecho constitucional a la autonomía personal y en su derecho de consentir o rechazar cierto tratamiento médico. Norwood Hosp. v. Muñoz, supra, págs. 1022-1023.
Asimismo, los tribunales estatales han descartado que respetar la decisión del paciente de rechazar cierto tratamiento médico afecte de forma alguna la integridad ética de la profesión médica. Concretamente, se ha resuelto que la ética médica sólo obliga al profesional de la salud a proveerle a su paciente la información necesaria para que éste tome una decisión informada sobre qué tratamiento está dispuesto a recibir, pero el médico no puede actuar en contra de la voluntad del paciente. Su función es proveer tratamiento médico de acuerdo con los deseos e intereses de sus pacientes, no asumir el rol de “padre sustituto” para sobreponerse a los deseos de un adulto competente. Matter Dubreuil, supra, pág. 823. Véase, además, Stamford Hosp. v. Vega, supra. A tono con lo anterior, se ha expresado que *918 el interés del Estado en proteger la profesión médica no está reñido con el derecho del paciente a rechazar la transfusión de sangre y, de estarlo, no lo supera. Norwood Hosp. v. Muñoz, supra, págs. 1023-1024.
Por último, se ha resuelto que los foros judiciales deben considerar el interés del Estado en proteger a terceros inocentes. Este interés es el que con más frecuencia se invoca en los tribunales en el contexto de casos sobre rechazo de tratamiento médico. La protección de terceros inocentes toma —en la mayoría de los casos— dos vertientes, a saber: el interés del Estado en proteger a menores de edad que pueden quedar abandonados por la muerte de sus padres y en que los ciudadanos se sometan a cierto tratamiento médico durante una crisis de salud pública.(13)
En cuanto a la primera vertiente, el poder de parens patriae del Estado le brinda un interés reconocido en el bienestar de los menores. La pregunta en estos casos es si a un adulto competente se le puede coartar su derecho de rechazar tratamiento médico debido a su condición de padre o madre. Ante tal planteamiento, algunos tribunales han expresado que, en la medida en que la muerte del paciente no redunde en el total abandono de un hijo menor de edad, el interés del Estado en el bienestar del menor no puede superar el derecho de un adulto competente de rechazar tratamiento médico. Véanse: Stamford Hosp. v. Vega, supra; Matter of Dubreuil, supra; Norwood Hosp. v. *919 Muñoz, supra.(14) Así, nos parecen acertadas las expresiones del máximo foro judicial de Nueva York, al indicar que “[l]os ciudadanos de este estado han tenido por mucho tiempo el derecho de tomar sus propias decisiones sobre su cuidado médico sin sujeción a su condición física o su condición de padres”. (Traducción nuestra.) Fosmire v. Nicoleau, supra, pág. 883.
Por otra parte, según se ha resuelto en varias jurisdicciones estatales, el derecho de un paciente de rechazar cierto tratamiento médico no puede estar limitado a aquellos pacientes que padecen una condición o estado particular. Por el contrario, dicha protección constitucional cobija a toda persona adulta competente que, consciente de las consecuencias médicas de su rechazo al tratamiento en cuestión, ha expresado su voluntad al respecto y esa voluntad puede ser probada con evidencia clara y convincente. Matter of Dubreuil, supra, pág. 823; Fosmire v. Nicoleau, supra, págs. 879-882. Véase, además, Conservatorship of Wendland, 28 P.3d 151 (Cal. 2001).
Luego de examinar los preceptos constitucionales pertinentes, así como la forma en que la jurisprudencia federal y estatal ha atendido controversias similares a la de autos, resumimos la normativa aplicable. Como mencionamos anteriormente, de acuerdo con nuestra jurisprudencia, el derecho de intimidad consagrado en la: Constitución del Estado Libre Asociado de Puerto Rico protege la inviolabilidad del cuerpo humano y el derecho de las personas a tomar decisiones respecto a éste, particularmente su derecho a decidir sobre su tratamiento médico. Véanse, e.g.: Santiago Otero v. Méndez, supra, pág. 557 esc. 24; Montes v. Fondo del Seguro del Estado, supra, págs. 203—204. Este *920 derecho de aceptar o rechazar tratamiento médico ha sido reconocido especialmente en el contexto de la doctrina del consentimiento informado. Además, el derecho de libertad de culto protegido constitucionalmente provee una salvaguarda adicional a aquellas personas cuyo rechazo de determinado tratamiento médico se base en creencias religiosas o cuestiones de fe.
Por otra parte, la Constitución de Estados Uni-dos —según interpretada por el Tribunal Supremo federal en Cruzan v. Director, Missouri Dept. of Health, supra, y su progenie— garantiza el derecho constitucional de todo paciente de rechazar tratamiento médico, siempre que la decisión sea informada y el paciente sea consciente de sus posibles consecuencias. De tratarse de un paciente incompetente, se puede requerir que se presente prueba clara y convincente de que su voluntad hubiese sido rechazar el tratamiento médico.
Como se desprende del análisis que precede, los tribunales estatales han sido consecuentes al aplicar dicha norma y han protegido el derecho de un paciente de rechazar transfusiones de sangre por razones religiosas. De esta forma, dichos foros han resuelto que al evaluar controversias sobre el rechazo de tratamiento médico, los tribunales deben tener como norte el respeto de la voluntad expresada por el paciente. Ello es así, incluso en aquellos casos en que la persona está inconsciente o no puede comunicarse, y quien recurre al tribunal es un mandatario o subrogado del paciente o sus familiares. Como consecuencia de lo anterior, ni un subrogado ni un familiar de un paciente pueden rechazar o consentir la administración de cierto tratamiento médico si no presentan prueba de que esa hubiese sido la voluntad del paciente en tales circunstancias.
Ahora bien, en vista de que ningún derecho es absoluto, se ha resuelto que, una vez se determine la voluntad del paciente, el tribunal debe sopesar el derecho de dicha per *921 sona de rechazar tratamiento médico frente a ciertos intereses apremiantes del Estado. La jurisprudencia examinada sugiere que, en la mayoría de las ocasiones, el balance de dichos intereses frente al derecho constitucional de un paciente de rechazar tratamiento favorecerá a este último.
IV
Cónsono con el derecho constitucional antes ex-puesto, y en atención al derecho de todo paciente de decidir respecto a cualquier tratamiento médico que ha de serle administrado, la Asamblea Legislativa de Puerto Rico aprobó la Carta de Derechos y Responsabilidades del Paciente, Ley Núm. 194 de 25 de agosto de 2000 (24 L.P.R.A. see. 3041 et seq.) (Ley Núm. 194). Dicha ley reconoce el derecho de todo paciente a participar plenamente de las decisiones relacionadas con su salud y cuidado médico. En lo concerniente a la controversia de autos, el referido estatuto establece que todo paciente podrá prestar su consentimiento para aceptar o rechazar tratamiento médico, así como manifestar su preferencia sobre algún tratamiento en particular en caso de que en determinado momento pierda la capacidad de expresar válidamente su consentimiento. Art. 9 de la Ley Núm. 194 (24 L.P.R.A. see. 3047).
Además, la Ley Núm. 194 impone a todo médico o profesional de la salud el deber de informar a sus pacientes sobre los derechos garantizados por dicha legislación, lo que según el estatuto incluye la opción de rechazar tratamiento. Art. 9(a) y (b) de la Ley Núm. 194, supra. Según dicha ley, todo médico o profesional de la salud está obligado a respetar y acatar las decisiones y preferencias expresadas por sus pacientes con relación a las opciones de tratamiento que se le ha de administrar. Art. 9(d) de la Ley Núm. 194, supra.
De igual forma, la referida legislación reco *922 noce el derecho de todo paciente que no se encuentre en condiciones de participar plenamente de las decisiones relacionadas con su cuidado médico, a estar representado en la toma de dichas decisiones por su padre, madre, tutor, custodio, encargado, cónyuge, pariente, representante legal, apoderado o cualquier persona designada por los tribunales. La ley también reconoce el derecho de un paciente a usar directrices o guías adelantadas, así como poderes o testamentos vitales (living wills) en relación con su tratamiento, o designar a una persona para que tome decisiones sobre tratamiento médico en su nombre cuando sea necesario. Art. 9(a) y (c) de la Ley Núm. 194, supra. Ello sin sujeción al padecimiento de alguna condición médica en particular.
Posteriormente, y en reconocimiento del derecho constitucional de aceptar o rechazar tratamiento médico, la Asamblea Legislativa aprobó la Ley Núm. 160 con el propósito de viabilizar el mecanismo de las declaraciones previas de voluntad y establecer los requisitos necesarios para su validez en casos particulares. Véase Exposición de Motivos, Ley Núm. 160 (2001 (Parte 1) Leyes de Puerto Rico 809). Dicho estatuto dispone que cualquier persona mayor de edad y en pleno disfrute de sus facultades men-tales puede expresar en cualquier momento su voluntad anticipada sobre el tratamiento médico que deberá serle o no serle administrado en caso de sufrir una condición de salud terminal o estado vegetativo persistente. Art. 3 de la Ley Núm. 160 (24 L.P.R.A. see. 3652). Esta legislación provee para que las personas puedan otorgar declaraciones de voluntad siempre que se cumplan ciertos requisitos específicos, que incluyen un juramento tomado ante notario. Art. 4 de la Ley Núm. 160 (24 L.P.R.A. see. 3653). Según la ley lo define, el tratamiento médico sobre el cual podrá disponerse en la declaración es cualquier tipo de tratamiento, procedimiento o intervención médica que se realiza a una persona para sostener, restaurar o implantar sus funciones *923 vitales, cuando se administra con el único potencial de prolongar artificialmente el momento de la muerte. Art. 2 de la Ley Núm. 160 (24 L.P.R.A. see. 3651).
Por último, el Art. 3 de la Ley Núm. 160 dispone que la declaración de voluntad podrá incluir la designación de un mandatario que tome decisiones sobre aceptación o rechazo de tratamiento en caso de que el declarante no pueda comunicarse por sí mismo. 24 L.P.R.A. see. 3652. En caso de que no se designe un mandatario, se considerará como tal al pariente mayor de edad más próximo según indique el orden sucesoral del Código Civil, considerándose en primer lugar al cónyuge. íd. No obstante, en el Art. 6 del estatuto se establece que la declaración de voluntad sólo será ejecutable una vez al declarante se le diagnostique una condición de salud terminal o se encuentre en estado vegetativo persistente. 24 L.P.R.A. see. 3655.
Con estos preceptos en mente, pasemos a disponer concretamente de la controversia ante nuestra consideración.
V
El señor Hernández Laboy suscribió un documento ante notario en el cual, por razones religiosas, rechazó de manera absoluta —y sin sujeción a condición de salud alguna— cualquier tratamiento médico que involucrara transfusiones de sangre. Asimismo, nombró al señor Tirado Flecha como su mandatario para que velara por que su voluntad se cumpliera en caso de no poder comunicarla él mismo. Los hechos ocurridos con posterioridad al otorgamiento de dicho documento nos obligan a interpretar el alcance de la Ley Núm. 160 y la validez de la declaración firmada por el señor Hernández Laboy.
A. De entrada, debemos considerar la facultad del mandatario de acudir a los foros judiciales para hacer valer la voluntad expresada por su mandante. Ello, en vista de que el Tribunal de Apelaciones resolvió que el señor *924 Tirado Flecha carecía de legitimación activa, pues, según su interpretación de la Ley Núm. 160, éste no podía acudir a los foros judiciales a reclamar a nombre del señor Hernández Laboy hasta tanto existiera un diagnóstico de condición de salud terminal o estado vegetativo persistente, lo cual no había ocurrido. La conclusión de dicho foro se basó en el Art. 6 de la Ley Núm. 160, supra, el cual, como hemos indicado, dispone que la declaración será ejecutable una vez se realice el referido diagnóstico. 24 L.P.R.A. see. 3655.
El concepto de legitimación activa se ha definido, en general, como la capacidad del demandante para realizar con eficacia actos procesales como parte litigante. Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559, 563 (1989). Para determinar si una parte tiene legitimación activa, debe cumplir con los requisitos siguientes: (1) haber sufrido un daño claro y palpable; (2) que el referido daño sea real, inmediato y preciso, y no abstracto o hipotético; (3) una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surja bajo el palio de la Constitución o de una ley. Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327, 331 (2000); Asoc. Maestros P.R. v. Srio. Educación, 137 DP.R. 528, 535 (1994).
En el caso de autos el señor Tirado Flecha fue designado por el señor Hernández Laboy como su mandatario para hacer valer su voluntad en caso de que estuviera impedido de comunicarse por sí mismo, sin precisar condición alguna. Específicamente, el señor Hernández Laboy hizo constar en el documento de declaración previa de voluntad que “[o]torgo a mi mandatario pleno poder y autoridad para asegurarse de que el personal médico obedezca las decisiones expresadas en el presente documento y que mi atención médica esté de acuerdo con mis valores y creencias. La autoridad de mi mandatario entrará en vigor mientras yo me halle incapacitado para tomar mis propias decisiones respecto a la atención médica”. (Enfasis suplido.) Apéndice, pág. 47. Conforme a ese mandato, lo que busca *925 vindicar el señor Tirado Flecha son los derechos que hubiese reclamado su mandante, quien, indiscutiblemente, tenía legitimación activa para reclamar sus propios derechos constitucionales, mas se encontraba impedido de hacerlo debido a su estado de salud. Es en ese momento, precisamente, en que se activa la función del mandatario. (15)
Por otro lado, el señor Tirado Flecha no solicitó tomar decisiones a nombre del señor Hernández Laboy, pues éste ya había plasmado sus deseos en el documento mencionado. Su única función era asegurarse que se cumpliera la voluntad previamente expresada del paciente. Precisamente, los mandatarios o subrogados no son más que una herramienta adicional para garantizar que la voluntad de un paciente de rechazar o consentir tratamiento médico sea respetada, aun cuando éste se encuentre en un estado de inconsciencia o no pueda comunicarse por sí mismo. Además, existe una diferencia entre tomar decisiones por una persona incompetente y hacerlo a nombre de ésta. Véase Cruzan v. Director, Missouri Dept. of Health, supra, pág. 287 esc. 12. En el caso de autos, el señor Tirado Flecha interesaba rechazar la transfusión de sangre a nombre del señor Hernández Laboy, según éste lo había solicitado en el documento suscrito.
Por lo tanto, y a pesar de que más adelante examinaremos la validez del documento en el que se realizó la designación de mandatario, resolvemos que no nos encontramos ante una situación de falta de legitimación activa, sino ante un reclamo judicial para hacer cumplir la voluntad dispuesta por un ciudadano que no puede comunicarse por sí mismo y ha designado a una persona específicamente para atender esa situación. Negarle al señor Hernández Laboy dicha garantía equivaldría a una violación de su derecho constitucional de rechazar tratamiento médico, pues *926 era la única forma práctica para éste hacer valer su voluntad. Por tal razón, concluimos que el foro apelativo erró al resolver que el señor Tirado Flecha no tenía legitimación activa y, a base de ello, desestimar el presente recurso.(16)
B. Según discutiéramos anteriormente, la Ley Núm. 160 dispone que el tipo de declaración anticipada allí contemplada, la cual puede incluir la designación de un mandatario para que haga valer la voluntad del paciente, será ejecutable cuando al declarante se le diagnostique una enfermedad terminal o un estado vegetativo persistente que le impida comunicarse por sí mismo. Véanse Art. 3 y Art. 6 de la Ley Núm. 160 (24 L.P.R.A. sees. 3652 y 3655). Es decir, dicha legislación regula específicamente las declaraciones de voluntad de un paciente que se encuentra en las circunstancias allí descritas y, por lo tanto, no contempla que un paciente que no ha sido diagnosticado con alguna de las condiciones mencionadas pueda rechazar válidamente determinado tratamiento médico mediante una declaración previa de voluntad.
Sabido es que la acción legislativa lleva consigo una presunción de constitucionalidad. E.L.A. v. Aguayo, supra, pág. 597. Por ello, los tribunales debemos intentar lograr una interpretación de la ley que preserve la constitucionalidad de ésta. Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990). Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, págs. 327-329. No obstante, y en vista de que la Ley Núm. 160 incide sobre el derecho constitucional y estatutariamente protegido de un ciudadano de expresar su voluntad respecto a la aceptación o rechazo de determinado *927 tratamiento médico, es menester examinar si dicha ley es cónsona con el derecho constitucional.
De acuerdo con el derecho de intimidad consagrado en nuestra Constitución y del interés libertario protegido por el debido proceso de ley, todo paciente tiene derecho de tomar decisiones sobre su tratamiento médico. Ello incluye el derecho de aceptar o rechazar determinado curso de acción relacionado con su cuidado médico, sin sujeción a diagnósticos particulares o condiciones específicas, aim cuando dicho rechazo pudiese resultar en la muerte de la persona.
A la luz de estos preceptos, al limitar la declaración de voluntad del paciente a situaciones en que exista un diagnóstico de condición de salud terminal o estado vegetativo persistente, la Ley Núm. 160 vulnera el derecho constitucionalmente protegido de tomar decisiones respecto a su cuerpo. Sin embargo, el propósito de ésta no fue limitar el derecho de rechazar tratamiento médico, sino proveer un mecanismo formal —la declaración previa de voluntad— para hacer valer los deseos del paciente. Véase Exposición de Motivos, Ley Núm. 160, supra. Ello es cónsono con lo resuelto en Cruzan v. Director, Missouri Dept. of Health, supra, relativo a la validez del requisito estatal de evidencia clara y convincente sobre la voluntad del paciente.
No obstante, al imponer el Art. 6 un límite a la voluntad de las personas y sujetar su efectividad a los diagnósticos particulares contenidos en dicha disposición, éste adolece de inconstitucionalidad.(17) Limitar nuestra interpretación a una mera lectura y aplicación literal del texto allí plasmado equivaldría a renunciar a nuestra máxima función constitucional e imponer un estrecho marco a la voluntad de todo aquel que no padezca alguno *928 de los dos diagnósticos especificados en la ley. Por ende, resolvemos que el mecanismo de la declaración previa de voluntad regulado no puede estar limitado a las dos instancias contenidas en la ley, sino que debe estar disponible para toda persona mayor de edad y competente que desee manifestar su voluntad de rechazar tratamiento médico. Claro está, si surgiera alguna controversia respecto a la validez o autenticidad del medio utilizado por el declarante para hacer constar su voluntad, se trataría entonces de un asunto de derecho probatorio a ser dirimido por un tribunal competente. Ello, sin embargo, sería un asunto colateral a la voluntad propiamente expresada.
Conforme al derecho antes expuesto, aun en el supuesto de que concluyéramos que la declaración otorgada por el señor Hernández Laboy —en la cual no limitó su rechazo de las transfusiones de sangre a padecer de una enfermedad terminal o encontrarse en un estado vegetativo persistente— no cumplió con los requisitos dispuestos en la Ley Núm. 160, su voluntad no queda desprovista de protección legal. Por el contrario, su derecho de rechazar transfusiones de sangre sin sujeción a un diagnóstico en particular, y de designar a una persona para que hiciera valer su voluntad en caso de no poder comunicarse por sí mismo, está garantizado por el derecho constitucional federal y puertorriqueño.
De esta forma —incluso en ausencia de una declaración previa de voluntad o designación de mandatario— la voluntad de un paciente de rechazar tratamiento médico debe ser respetada. En tales casos, el Tribunal Supremo de Estados Unidos determinó que sería válido exigir que dicha voluntad se demuestre mediante prueba clara y convincente. Cruzan v. Director, Missouri Dept. of Health, supra. Lo anterior sólo debe estar sujeto a un balance entre la voluntad del paciente y los intereses apremiantes que pudiera tener el Estado en impedir que se cumpla dicha voluntad.
En el caso de autos, el Tribunal de Primera Instancia *929 correctamente admitió como válido el documento presentado por el señor Tirado Flecha en el que se hacía constar la voluntad del señor Hernández Laboy de rechazar transfusiones de sangre en toda circunstancia. Por tal razón, y cónsono con la jurisprudencia antes citada, el tribunal realizó un balance entre el derecho del señor Hernández La-boy a rechazar tratamiento médico y los intereses del Estado en intervenir con dicha decisión. En este caso, el interés reclamado era proteger al hijo menor de edad de las partes y evitar que sufriera un abandono en el supuesto de la muerte de su padre.
Tras escuchar los argumentos de las partes, el foro de instancia determinó que la señora Lozada Tirado no podía hacerse cargo del niño por sí sola. El tribunal se basó en que, supuestamente, la señora Lozada Tirado era una persona de “escasos recursos económicos” y con “una capacidad intelectual baja”. En atención a lo anterior, resolvió que la muerte del señor Hernández Laboy dejaría a su hijo en un estado de abandono, por lo que el Estado tenía un interés apremiante en obligarlo a recibir sangre y así, según el tribunal, evitar su muerte. De esta forma, el foro judicial concedió la solicitud de la señora Lozada Tirado para que se ordenara al hospital transfundir sangre y dializar al señor Hernández Laboy de ser necesario.
El interés estatal invocado por el tribunal —a pesar de que no hay evidencia de que el Estado compareciera a los procedimientos para reclamarlo— se trata del interés en evitar el abandono de menores de edad, como parte del poder parens patriae del Estado.(18) Este es una vertiente *930 del interés en proteger a terceros inocentes, reconocido en la jurisprudencia. Según se desprende del análisis que precede, los foros judiciales han rechazado anteponer dicho interés frente al derecho de rechazar tratamiento médico de un paciente adulto padre de menores de edad, cuando el otro padre o algún familiar del menor podría hacerse cargo de éste en la eventualidad de que el paciente muera. Véanse: Stamford Hosp. v. Vega, supra; Matter of Dubreuil, supra; Norwood Hosp. v. Muñoz, supra.
Dado que se trata de limitar o anular un derecho constitucional, el análisis de los intereses del Estado no debe tomarse livianamente por los tribunales. Recordemos que en Estados Unidos el derecho de rechazar tratamiento médico se deriva de la doctrina de consentimiento informado del derecho común anglosajón y de la cláusula de debido proceso de ley de la Constitución federal. Mientras, en nuestra jurisdicción, dicho derecho se reconoce, no sólo como parte de la doctrina de consentimiento informado, sino como parte del derecho de intimidad expresamente garantizado en nuestra Constitución como un derecho fundamental. Por lo tanto, en estos casos, el alegado abandono no puede presumirse, sino que debe probarse con evidencia clara y convincente. Véase Matter ofDubreuil, supra. La mera preocupación del Estado por el bienestar del menor no es suficiente. Véase Norwood Hosp. v. Muñoz, supra.
Según se desprende del expediente del caso ante nuestra consideración, la señora Lozada Tirado no padecía de incapacidad física o mental alguna que le impidiera encargarse de la crianza del menor. Si bien el tribunal señaló que la señora Lozada Tirado es una persona de “escasos recursos económicos” y “capacidad intelectual baja”, ello de por sí no *931 constituye una incapacidad absoluta para continuar cuidando a su hijo menor de edad. Además, no se probó que los hermanos mayores de edad del menor no pudieran ayudar en su crianza, pues el mero hecho de que éstos no vivieran cerca, según surge de la resolución emitida por el Tribunal de Primera Instancia, no impide que la familia pudiera hacer arreglos para manejar la situación.(19) De hecho, la señora Lozada Tirado compareció a la vista acompañada de dos hijas mayores de edad.
Asimismo, el foro de instancia hizo constar en su resolución que los ingresos del núcleo familiar compuesto por el señor Hernández Laboy, su esposa y su hijo menor de edad consistían en los ingresos de la señora Lozada Tirado y los beneficios de seguro social del señor Hernández Laboy. No obstante, el tribunal no tomó en cuenta que el menor podría recibir algunos beneficios del seguro social en la eventualidad de la muerte de su padre.
Por último, el Tribunal de Primera Instancia consideró que el menor podría afectarse emocionalmente por la muerte del señor Hernández Laboy, luego de haber sufrido también la muerte de su padre biológico. Reconocemos que el bienestar emocional y psíquico del menor es importante y amerita preocupación y consideración. Entendemos, sin embargo, que ese factor tampoco es suficiente para soslayar la voluntad firme, expresa y constitucionalmente protegida de un adulto competente de rechazar determinado tratamiento médico.
En suma, consideramos que lo anteriormente expuesto no configura el abandono alegado por la señora Lozada Tirado, por lo que debió prevalecer la voluntad expresada por el señor Hernández Laboy de no recibir sangre en ninguna circunstancia. Por ende, el foro de instancia erró al acceder al pedido de la esposa del señor Hernández Laboy para *932 realizarle una transfusión de sangre, a pesar de que el propio tribunal tuvo ante sí evidencia clara y convincente, mediante el documento de declaración previa de voluntad, del rechazo expreso del señor Hernández Laboy a dicho tratamiento.
Por otro lado, existe otro fundamento constitucional, además de la violación a su derecho de intimidad y a su interés libertario, para validar el documento suscrito por el señor Hernández Laboy y proteger su voluntad expresa. Específicamente en el caso de autos no podemos pasar por alto el hecho de que el rechazo del paciente a las transfusiones de sangre se basó en sus creencias religiosas, por lo que el Art. 6 de la Ley Núm. 160, supra, en tanto en cuanto condiciona sü aplicación solamente a instancias en que el paciente sufra una enfermedad terminal o estado vegetativo persistente, infringe el derecho de libertad de culto del señor Hernández Laboy, según protegido tanto por la Constitución de Estados Unidos como la Constitución de Puerto Rico. Art. II, Sec. 3, Const. E.L.A., supra; Enmda. 1, Const. E.E. U.U., L.P.R.A., Tomo 1. A pesar de que la Ley Núm. 160 es una ley neutral y de aplicabilidad general, ésta impone, mediante el Art. 6, una carga sobre la práctica religiosa del señor Hernández Laboy. Por lo tanto, sería necesario que el Estado hiciera una concesión para permitir el libre ejercicio de su religión.
No obstante, como hemos explicado, los límites impuestos por dicho estatuto infringen el derecho de intimidad y libertad individual, por lo que éstos no pueden sostenerse, aun en ausencia de un planteamiento de libertad de culto. En estos casos particulares, se ha resuelto que el derecho de intimidad del paciente coexiste y se entrelaza con su derecho de libertad de culto para proteger su decisión. Matter of Dubreuil, supra, pág. 822.
Conforme a lo anterior, el rechazo de tratamiento médico como parte de una objeción de conciencia o por motivos religiosos debe ser respetado en toda persona *933 que goce de sano juicio, a menos que en su ejercicio se cause grave daño a la vida de terceras personas. Es nuestro criterio que la evaluación del rechazo de un paciente a cierto tratamiento médico por razones religiosas o de conciencia, no debe basarse en un juicio subjetivo sobre dicha conducta, sino en el respeto a la dignidad humana y a la libertad individual y de culto de esa persona, la cual sólo podría verse limitada por un interés mayor del Estado.
En el caso específico del señor Hernández Laboy, su rechazo de las transfusiones de sangre no respondía a su desprecio por la vida, sino a su apego a una vida acorde con los postulados de su fe. Según surge del expediente, para los Testigos de Jehová el rechazo a recibir sangre —en toda circunstancia y sin sujeción a condición médica alguna— es un principio medular de su religión.(20) Por tal razón, el Art. 6 de la Ley Núm. 160, supra, según aplicado por los foros a quo, impone una carga sustancial injustificada a las prácticas religiosas del señor Hernández Laboy que infringió su derecho constitucional a la libertad de culto.
En fin, hoy resolvemos que, tanto la Constitución del Estado Libre Asociado de Puerto Rico como la Constitución de Estados Unidos protegen el derecho de las personas a rechazar tratamiento médico, aun cuando su decisión acarree consecuencias fatales para su vida. Esto, en virtud del principio de la inviolabilidad de la dignidad del ser humano y del derecho de intimidad consagrados en nuestra Constitución, así como del derecho de libertad protegido por el debido proceso de ley y el derecho de libertad de culto plasmados tanto en nuestra Constitución como en la de Estados Unidos. Tales derechos cobijan también la fa *934 cuitad de expresar esa voluntad anticipadamente. En ese sentido, sujetar la voluntad expresada por un ciudadano a las dos condiciones específicamente dispuestas en el Art. 6 de la Ley Núm. 160 infringe las más fundamentales libertades constitucionales de cada ser humano, más aún cuando se trata de un rechazo a determinado tratamiento por razones religiosas. Por ello, a pesar de reconocer la validez de las declaraciones previas de voluntad —y sin prejuzgar cualquier otra controversia que pudiera surgir al amparo de la referida ley— sostenemos que las protecciones constitucionales aplicables operan más allá de los límites dispuestos en el Art. 6 de la Ley Núm. 160, sujeto a que se demuestre cuál hubiese sido la decisión del paciente y al balance de aquellos intereses apremiantes que pudiera invocar el Estado.
VI
Por los fundamentos antes expuestos, revocamos la resolución del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.

La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión de conformidad. La Jueza Asociada Señora Pabón Charneco disintió con una opinión escrita, a la que se unió el Juez Asociado Señor Martínez Torres. El Juez Asociado Señor Rivera Pérez disintió sin opinión escrita.
Opinión de conformidad emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
The only part of the conduct of anyone for which he is amenable to society is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his *935 own body and mind, the individual is sovereign.
John Stuart Mill, On Liberty.
Creo que todo adulto con plena capacidad para obrar tiene un derecho a rehusar el tratamiento médico, aun cuando tal curso de acción pueda conllevar, como consecuencia natural, su muerte. Ello, como manifestación del componente de la libertad de la cláusula del debido proceso de ley, o como afirmación de su autonomía en la toma de decisiones personales conforme al derecho a la intimidad y a la inviolabilidad de la dignidad del ser humano. Porque entiendo que la Constitución del Estado Libre Asociado de Puerto Rico reconoce este derecho, estoy conforme con la determinación que hoy anuncia este Tribunal.
I
El Sr. Víctor Hernández Laboy, otorgó una declaración de voluntad según la Ley Núm. 160 de 17 de noviembre de 2001, Ley de Declaración Previa de Voluntad sobre Tratamiento Médico en Caso de Sufrir una Condición de Salud Terminal o de Estado Vegetativo Persistente,(1) mediante la cual designó como mandatario al Sr. Roberto Tirado y expresó su rechazo a transfusiones de sangre o a que se prolongue su vida en caso de estar desahuciado. Un año después, Hernández sufrió un accidente automovilístico que provocó su reclusión en la Unidad de Trauma Intensivo de Centro Médico. La Sra. Luz Lozada, esposa del declarante, acudió al Tribunal de Primera Instancia y solicitó que se le transfundiera sangre. El tribunal, mediante or-den ex parte, dispuso que se realizara la transfusión así como otros procedimientos que fuesen necesarios para preservar la vida del declarante.
*936 El Centro Médico no puso en vigor la orden porque el señor Tirado se opuso a su ejecución tras presentar la declaración de voluntad del señor Hernández. La señora Lozada junto a los hijos del declarante acudieron nuevamente al tribunal. Solicitaron que se ordenara la transfusión de sangre o dializar al declarante, si así lo requería su condición. El tribunal emitió una orden según lo solicitado.(2) Posteriormente, se celebró una vista en la cual el señor Tirado argüyó que era el mandatario del señor Hernández y que la orden emitida constituía una violación al derecho a la libertad de culto e intimidad del declarante. El tribunal decidió mantener en vigor la orden. Transcurridos varios días, y luego de una transfusión de sangre, el señor Hernández falleció.
El señor Tirado y la Congregación de los Testigos de Jehová, de la cual era feligrés el declarante, acudieron al Tribunal de Apelaciones. Este foro determinó que ambos carecían de legitimación activa. Resolvió que el señor Tirado no probó que la declaración de voluntad era ejecutable, toda vez que no demostró que el declarante estuviese en estado vegetativo persistente o en condición terminal de salud. Asimismo, sostuvo que la Congregación carecía de legitimación activa, pues no fue parte en el tribunal de instancia. Inconformes, acudieron ante este Foro la Congregación y el señor Tirado.
II
Los adelantos científicos y tecnológicos de las últimas décadas han posibilitado la extensión cuasi artificial de la vida, a unos límites que nos resultan cada vez más *937 sorprendentes. Prolongando la vida más allá de su propia muerte y viabilizando que una persona permanezca en un estado crepuscular de “posvida y antemuerte”.(3) Fueron, precisamente, esos desarrollos tecnológicos, “que causaban una creciente dificultad en la toma de decisiones cientificomédicas, [lo que] ... dio lugar al nacimiento de la bioética”. N. Casellas Caralt, Orígenes, desarrollo y problemas actuales de la bioética: una breve introducción, 76 Rev. Jur. U.P.R. 1115, 1116 (2007). Disciplina ésta que examina “las dimensiones éticas de las actuaciones humanas ... en las ciencias de la vida en toda su amplitud ... con la finalidad de facilitar la toma de decisiones”. íd., pág. 1118.
La figura jurídica de las voluntades anticipadas, o el testamento vital, o las directrices anticipadas —todos nombres para una misma figura— se ha categorizado como un mecanismo de autodefensa del paciente frente al llamado “encarnizamiento terapéutico” de la Medicina. A. Andruet, Breve Exégesis del Llamado ‘Testamento Vital’, www.ajs.es/ downloads/voll0025.pdf. Naturalmente, este es un tema que encierra una realidad compleja donde entrelazan valores jurídicos, filosóficos y éticos con valores asistenciales y médicos, no siempre en total armonía. Véase Casellas Caralt, op. cit, págs. 1118-1119. Lo cierto es que el testamento vital pretende regular el consentimiento informado en una etapa vital determinada. íd. El profesor Pedro Silva Ruiz define esta figura jurídica de la forma siguiente: “[E]l testamento vital es una orden escrita dada por un individuo, mientras se encuentra en el ejercicio de sus facultades mentales, indicativa del tratamiento médico que quisiera recibir en el momento en que, como paciente se encuentre incapacitado ... para tomar decisiones.” P.F. Silva Ruiz, El *938 derecho a morir con dignidad y el testamento vital, 592— 593 Rev. Gen. Der. 425, 435 (1994).
El profesor Gonzalo Herranz, de otra parte, nos indica que la introducción de esta figura “no sólo está enriqueciendo los contenidos y el estilo de la deontología profesional de médicos y enfermeras, sino que está dando una nueva tonalidad al modo de asistir y tratar a los pacientes, de respetarlos en cuanto seres humanos en la circunstancia específica en la que ellos ya no son capaces de llevar el timón de su propia existencia”. G. Herranz, Voluntades anticipadas y testamento vital, 179—180 Informaciones Psiquiátricas 41 (lero y 2do semestres 2005), disponible en www. revistahospitalarias. org/info_2005/01_ 17 9_0 5 .htm. Véase, además, C.M. Romeo Casabona (dir.), La ética y el derecho ante la hiomedicina del futuro, Bilbao, Ed. Univ. de Deusto, 2006, Cap. 3.
Las voluntades anticipadas o el llamado testamento vital responden al ideario de afirmación de la autonomía de la voluntad. J.L. Requero Ibañez, El testamento vital y las voluntades anticipadas: aproximación al ordenamiento español, 4 La Ley 1899 (2002); Herranz, op. cit. Valor que se configura como “uno de los principios fundamentales en la ética biomédica .... Prescribiendo que £las acciones y las elecciones autónomas no deben ser constreñidas por los demás’ ”. J. Sanllehí, A vueltas con el principio de autonomía, en M. Casado (comp.), Estudios de Bioética y Derecho, Valencia, Ed. Tirant lo Blanch, 2000, pág. 101. En este tenor, la profesora Casellas Caralt nos indica que “[c]uando en la reflexión bioética se hace referencia al principio de la autonomía, se habla de libertad, (£[e]l valor de la autonomía, como capacidad de tomar decisiones por uno mismo, no sería más que una forma de manifestación de la libertad, y de justicia con igualdad, que tiene £en el campo de la sanidad una aplicación importantísima’ ”. (Corchetes en el original y escolios omitidos.) Casellas Caralt, op. cit., pág. 1140.
*939 La magistrada Aída Kemelmajer de Carlucci, en ocasión de celebrarse en Puerto Rico el XIV Congreso Internacional de Derecho de Familia, abordó el tema de las voluntades anticipadas. En su ponencia apuntó que la autonomía de la voluntad, “es la finalidad de las directivas anticipadas; su objetivo sería reforzar la autonomía del paciente y garantizarle un efectivo y pleno ejercicio de su derecho personalísimo”. (Énfasis nuestro.) A. Kemelmajer de Carlucci, Las voluntades anticipadas: una apertura a favor del reconocimiento de la autonomía de la voluntad para expresar decisiones bioéticas, 41 Rev. Jur. U.I.P.R. 135, 157 (2006). Reconoce, que “hay consenso en que el cuidado de la salud propia, cuando la conducta descuidada no compromete a terceros, se recluye en el ámbito de la privacidad. La conducta es autorreferente; es decir, se refiere exclusivamente a la persona que cuida o descuida su salud. Dicho en otras palabras, la salud propia, en tanto no altera la de los terceros, entra en el ámbito de la autonomía de la voluntad”. (Énfasis en el original suprimido, énfasis nuestro y escolio omitido.) Id., pág. 156.
Como hemos indicado, las voluntades anticipadas recogen la expresión del individuo, quien, desde su intimidad, deja predeterminado para el caso de enfermedad o accidente, su deseo sobre los tratamientos que quiere que se le apliquen. Debemos tener presente que habrá quien entienda que “el derecho a la vida no puede reducirse a la mera subsistencia, sino que implica el vivir adecuadamente en condiciones de dignidad”, y esta figura jurídica ofrece un vehículo para concretizar su voluntad o su deseo íntimo sobre cómo conducir su vida. A. Valencia Zea y A. Ortiz Monsalve, Derecho Civil: parte general y personas, 16ta ed., Bogotá, Ed. Temis, 2006, Vol. I, pág. 430.(4)
*940 Estos fundamentos que le sirven de soporte, como sabemos, animan también el consentimiento informado que todo médico requiere de un paciente previo a someterlo a un tratamiento, por lo que se les ha catalogado como variación de éste. Requero Ibañez, op. cit., pág. 1900. El consentimiento informado es el derecho a la información que tiene el paciente y, en respuesta a la información que recibe, dar su aprobación. Es así, la manifestación libre, consciente e inequívoca de la voluntad del paciente. M. Galán Juárez, Intimidad: nuevas dimensiones de un viejo derecho, Madrid, Ed. U. Ramón Areces, 2004, págs. 240-242. La diferencia con las voluntades anticipadas es, entonces, que en estos casos el requerimiento no fluye del médico al paciente sino de éste último al primero. Al fin y a la postre, como consentimiento anticipado que es, “su fin es suplir el consentimiento informado cuando las circunstancias no permitan al paciente expresar personalmente su voluntad”. Requero Ibañez, op. cit., pág. 1901. Adviértase también que el derecho a consentir lleva implícito el derecho a rechazar.
Recapitulando, la figura jurídica de las voluntades anticipadas o del testamento vital tiene como fundamento el valor de la dignidad humana, de la autonomía y del derecho de toda persona a la autodeterminación; además de ser una modalidad del principio del consentimiento informado. Considero, entonces, que al contextualizar la ley que las regula, debemos adelantar el fundamento que les sirve de puntal. Ello, porque entiendo que cualquier aproximación al tema que nos ocupa nos impone, en correcta metodología adjudicativa, no sólo interpretar o ponderar el contenido y *941 la estructura jurídica de la norma regulada, sino más que nada, qué hay detrás de ésta, qué bien jurídico pretende tutelar, a quién va destinada y porqué tiene un contenido y no otro.
III
En Whalen v. Roe, 429 U.S. 589, 598-600 (1977), el Tribunal Supremo de Estados Unidos catalogó el principio de la autonomía en la toma de decisiones personales importantes como una de las vertientes del derecho a la intimidad. Sobre esto, indicó lo siguiente:
... The cases sometimes characterized as protecting “privacy” have in fact involved two different kinds on interests. One is the individual interest in avoiding disclosures of personal matters, and another is the interest in independence in making certain kind of important decisions. (Énfasis nuestro y escolio omitido.) Id. Véanse, además: Griswold v. Connecticut, 381 U.S. 479 (1965); Eisenstadt v. Baird, 405 U.S. 438 (1972).
Antes bien, el componente sustantivo de libertad de la cláusula del debido proceso de ley de la Constitución de Estados Unidos, se ha perfilado en la doctrina constitucional norteamericana como el vehículo a través del cual se reconduce el análisis de esta modalidad del derecho a la intimidad. En Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851 (1992), reiterado en Lawrence v. Texas, 539 U.S. 558, 574 (2003), el Tribunal Supremo lo expresó así: “At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.”
Las decisiones personales protegidas por el Tribunal Supremo de Estados Unidos mediante esta cláusula constitucional cubren una miríada de intereses, entre éstos, y en lo que nos atañe, destaca el llamado derecho a una muerte *942 digna.(5) E.g., Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261 (1990). En Cruzan, en el proceso de validar el estándar de prueba requerido por la Constitución de Estados Unidos para determinar si se accede a descontinuar los métodos artificiales de alimentación de una paciente en estado vegetativo permanente, ante la ausencia de una expresión concreta y por escrito de ésta, el Tribunal Supremo aseveró que su trayectoria jurisprudencial dejaba establecido que bajo la Constitución de Estados Unidos toda persona tenía un derecho a rechazar un tratamiento médico no deseado como exigencia del debido proceso de ley. El Tribunal indicó: “The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions.” íd., pág. 278. Véase, E. Chemerinsky, Constitutional Law: Principles and Policies, 3ra ed., Nueva York, Ed. Aspen, 2006, pág. 848 (“Generally, there is a constitutional right of individuals to refuse medical treatment”).
Aun antes de Cruzan v. Director, Missouri Dept. of Health, supra, y evidentemente después, distintas jurisdicciones estatales de Estados Unidos reconocían el derecho de una persona a rechazar un tratamiento médico no deseado como una manifestación del ejercicio a la autodeterminación. Así, valoran, en el proceso, las voluntades anticipadas o el testamento vital como el mecanismo más idóneo para hacer efectiva esa expresión. Consúltese a manera de ilustración, entre otros: Matter of Quinlan, 355 A.2d 647 (1976), cert, denegado sub nom, Garger v. New Jersey, 429 U.S. 922 (1977); In re Duran, 769 A.2d 497 (2001); In re Guardianship of Browning, 568 So. 2d 4 (1990); In re Martin, 538 N.W.2d 399 (1995); Rasmussen by Mitchell v. Fle *943 ming, 741 P.2d 667 (Ariz. 1987); Matter of Westchester County Med. Ctr., 531 N.E.2d 607 (1988); Saunders v. State, 492 N.Y.S.2d 510 (1985); State v. McAfee, 385 S.E.2d 651 (1989); Knight v. Beverly Health Care Bay Manor, 820 So. 2d 92 (2001); San Juan-Torregrosa v. Garcia, 80 S.W.3d 539 (2002); In re Gardner, 534 A.2d 947 (1987); Woods v. Com., 142 S.W.3d 24 (2004). En Cruzan, la Juez O’Connor, en su opinion concurrente, al referirse a los testamentos vitales, indicó: “These procedures for surrogate decisionmaking, which appear to be rapidly gaining in acceptance, may be a valuable additional safeguard of the patient’s interest in directing his medical care.” Cruzan v. Director, Missouri Dept. of Health, supra, págs. 291-292 (O’Connor, J., opinión concurrente).
Pasemos ahora a considerar la situación de las voluntades anticipadas en Puerto Rico, no tan sólo desde el punto de vista estatutario, sino también desde su dimensión constitucional.
IV
La Constitución del Estado Libre Asociado de Puerto Rico garantiza que la dignidad del ser humano es inviolable y que toda persona tiene el derecho a la protección contra ataques a su honra, a su reputación y a su vida privada o familiar. Secs. 1 y 8, Art. II, Constitución del Estado Libre Asociado, L.P.R.A., Tomo l.(6) El Informe de la Comisión de Carta de Derechos a la Convención Constituyente nos aclara cómo el derecho a la intimidad que recoge nuestra Carta Suprema entrelaza con el valor a la protección de la dignidad humana, el cual subyace, como principio fundamental, el documento constitucional. Sobre esto se indica:
*944 La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias [sic] abusivas de las autoridades. La fórmula propuesta en la sección 8 cubre ambos aspectos. Complementa constitucionalmente lo dispuesto en la sección 10 y cubre el campo conocido en el derecho norteamericano como el “right to privacy’ particularmente importante en el mundo moderno. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2566 (1951).
El presidente de la Comisión, Dr. Jaime Benitez, al presentar ante el seno de la Convención el Informe de la Comisión, aclaró lo siguiente:
Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición. Tal vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable. Esta es la piedra angular y básica de la democracia. En ella radica su profunda fuerza y vitalidad moral. Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla. 2 Diario de Sesiones 1103 (1952). Véase además, J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. U.P.R., 1982, Vol. 3, págs. 175-176 y 189-190.
La dignidad humana se constituye así como punto de referencia o valor jurídico supremo en el orden constitucional. Deconstruir su contenido se dificulta mientras no contemos con una definición que sea satisfactoria para todos. No obstante, si bien es “imposible determinar de modo satisfactorio qué es la dignidad de la persona humana ... sí es posible [manifiestamente] fijar cuándo se le está vulnerando”. (Enfasis en el original.) I. Von Münch, *945 La dignidad del hombre en el derecho constitucional, 5 Rev. Esp. Der. Const. 9, 19 (mayo-agosto 1982).
Independientemente de lo indicado, podemos aseverar que la dignidad humana tiene como fundamento la propia libertad y autonomía del individuo. Véase G. Peces-Barba Martínez, La Dignidad de la Persona desde la Filosofía del Derecho, 2da ed., Madrid, Ed. Dykinson, 2003, págs. 68-69. Esta “supone algo más que la mera garantía negativa de que la persona no va a ser objeto de ofensas o humillaciones, sino que supone también la afirmación del pleno desarrollo de la personalidad de cada individuo. El pleno desarrollo de la personalidad implica, a su vez, de un lado, el reconocimiento de la total autodisponibilidad, sin interferencias o impedimentos externos, de las posibilidades de actuación propias de cada hombre; de otro, la autodeterminación que surge de la libre proyección histórica de la razón humana, antes que de una predeterminación dada por la naturaleza de una vez por todas”. (Énfasis en original.) Galán Juárez, op. cit., págs. 116-117. Es, a fin de cuentas, como nos recuerda el profesor Peces-Barba, “un proyecto que debe realizarse y conquistarse”. Peces-Barba Martínez, op. cit., pág. 68.
La dignidad humana es, por lo tanto, una empresa continua de autorrealización que se manifiesta en la autodeterminación consciente y responsable de la propia vida y que lleva consigo la pretensión al respeto por parte de los demás. Al igual se expresa el profesor Hiram Meléndez Juarbe al señalar:
[T]he most diverse authorities on the subject have recognized that human dignity is generally associated with the notion of respect for the intrinsic worth of every person or, in a word, “personhood”. Those who have tried to give precise content to this principle have identified, as an important corollary, the protection of autonomous choice in the development of personal identity. For one commentator human dignity entails that “a high priority should be accorded in political, social and legal arrangements to individual choices in such matters as belief, way of life, attitudes and the conduct of public affairs.” (Énfa *946 sis en el original y citas omitidas.) H. Meléndez Juarbe, Privacy in Puerto Rico and the Madman’s Plight: Decisions, 9 Geo. J. Gender & L. 1, 45 (2008).
De otra parte, los contornos del derecho a la intimidad son también de difícil concreción. Se trata de un derecho complejo, que acusa múltiples manifestaciones. Lo que sí hemos expresado, constantemente, es que ocupa un lugar de primacía frente a otros derechos y que “responde a un concepto del individuo hondamente arraigado en nuestra cultura”. E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 439 (1975). Ala misma vez, es reflejo de la formulación de una “Carta de Derechos de factura más ancha que la tradicional, que recog[e] el sentir común de culturas diversas sobre nuevas categorías de derechos”. Id., pág. 440. He-mos considerado que este derecho “constituye un ámbito exento capaz de impedir y limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular”. López Tristani v. Maldonado, 168 D.P.R. 838 (2006).
Soy del criterio que el derecho a la intimidad es un derecho dilatado, que “cuando más se focaliza el objeto del derecho para dar razón de él, más amplio y genérico se nos muestra. [Y a]l intentar acotarlo y precisarlo, se nos escapa”. N. González Gaitano, El deber de respeto a la intimidad, Pamplona, Ed. U. Navarra, 1990, pág. 149. Todo lo cual aconseja a “no definir lo indefinible”. Id., pág. 151. A pesar de lo dicho, considero adecuada la aproximación al tema del profesor Rebollo Delgado, por lo que le cito extensamente:
El derecho a la intimidad en su configuración nuclear es un derecho subjetivo, de defensa de mía parcela de nuestra vida que queremos mantener reservada, y de la que tenemos plena disposición. Es también una garantía de pluralismo y de democracia, en la medida que es en lo privado donde radica la diversidad, la singularidad, que se proyecta en un sistema democrático en el pluralismo. Es un derecho positivo, es decir, está inserto en nuestra Constitución y configurado como un de *947 recho de rango superior en base a sus garantías y a su esencialidad. Se instituye el derecho a la intimidad también como una expresión de libertad, como una manifestación de la misma. Por último, el derecho a la intimidad es la concreción de uno de los fundamentos que el constituyente establece para la correcta convivencia social, como es en esencia la dignidad humana, la garantía de los derechos inviolables que son inherentes a la persona, y el libre desarrollo de su personalidad. Se deduce pues, la importancia del derecho a la intimidad, tanto por el ámbito que protege, como por el fin al que obedece su protección. Pero aún es más significativo el hecho de que es un derecho que viene de forma directa a posibilitar una existencia pacífica del ser humano, tanto consigo mismo, como con los demás seres con que convive, siendo este un objetivo nuclear de toda sociedad. L. Rebollo Delgado, El derecho fundamental a la intimidad, 2da ed., Madrid, Ed. Dykinson, 2005, pág. 125.
Así entendido, el derecho a la intimidad necesariamente protege la prerrogativa de toda persona a tomar ciertas decisiones importantes e íntimas sobre cómo conducir la vida misma como manifestación de su autorrealización. Véanse: López Vives v. Policía de P.R., 118 D.P.R. 219, 238 (1987) (Naveira Merly, J., opinión concurrente); Sostre Lacot. v. Echelin of PR, Inc., 126 D.P.R. 781 (1990) (Negrón García, J., voto disidente); Salva Santiago v. Torres Padró, 171 D.P.R. 7154 (2007) (opinión disidente). Véase, además, L.J. Mieres Mieres, Intimidad Personal y Familiar, Navarra, Ed. Aranzadi, 2002, págs. 29-33. Solamente en la intimidad es posible que una persona actúe libremente sin que el ojo ajeno atice y esclavice.
Conforme a lo expresado, sostengo que el derecho a rechazar tratamiento médico es una manifestación más de la voluntad individualizada de la persona respecto a la elección y desarrollo de su plan de vida. Es cada cual quien es “el guardián natural de su propia salud, sea física, mental o espiritual”. Galán Juárez, op. cit., pág. 130. Esta es una decisión autónoma tomada desde lo más íntimo, a través de la cual, “regimos nuestro destino (individualmente y en relación con otros), decidimos quiénes somos y queremos ser y, por ende, la forma en que nos proponemos vivir.” (Bastar *948 dillas en original.) H. Meléndez Juarbe, La Constitución en ceros y unos: un acercamiento digital al derecho a la intimidad y la seguridad jurídica, 77 Rev. Jur. U.RR. 45, 49 (2007).
El rechazo a la distanasia no es otra cosa sino valorar la dignidad humana. El derecho a rehusar tratamiento médico es, por lo tanto, de dimensión constitucional y se asienta, necesariamente, sobre el derecho a la intimidad y al derecho a la dignidad del ser humano. Además de ser corolario del principio del consentimiento informado, como resuelve la mayoría.
V
A. La Exposición de Motivos de la Ley Núm. 160 (2001 (Parte 1) Leyes de Puerto Rico 809), así como su historial legislativo, ponen de manifiesto que el legislador fue consciente de las implicaciones que la ley propuesta tenía sobre el derecho a la intimidad del individuo así como sobre su dignidad. A esos efectos, la exposición de motivos señala que la ley “atiende al reclamo del derecho a la intimidad y al reconocimiento de la autonomía de la voluntad del individuo para integrar a nuestro ordenamiento jurídico un proceso legal mediante el cual el individuo mayor de edad, en pleno uso de sus facultades mentales” pueda rechazar un tratamiento médico anticipadamente. Id. El Informe de la Comisión de lo Jurídico del Senado de Puerto Rico, sobre el P. de la C. 386, pág. 15, por su parte, abundó sobre el particular y reconoció que a todo paciente en Puerto Rico le asiste el derecho “a la autodeterminación, como parte de su derecho constitucional a la intimidad, es decir, a decidir libremente qué hacer con su cuerpo”.
Ello, no obstante, el legislador sólo proveyó para que las directrices anticipadas estuvieran disponibles para aquellos casos en los que el paciente hubiese sido diagnosticado con una condición terminal o estuviese en estado vegeta *949 tivo persistente, lo que a su vez limita el ejercicio de la discreción del mandatario, impidiéndole que haga efectiva la voluntad declarada.
Recordemos que, en este caso, el señor Hernández La-boy, en su testamento vital indicó que rechazaba
... absoluta, inequívoca y resueltamente sangre alogénica (sangre de otra persona) y sangre autóloga almacenada (mi propia sangre almacenada) en toda circunstancia, sin importar cuál sea mi estado de salud. Esto significa que no se me administre sangre total ni ninguno de sus componentes principales ... sean cuales sean las consecuencias. No acepto sangre aún cuando el personal médico ... crea que sólo la transfusión sanguínea preservará mi vida o mi salud. (Énfasis nuestro.) Apéndice 1 de la Petición de certioriari, pág. 17.
Sostengo, entonces, que circunscribir el ejercicio de la voluntad del señor Hernández Laboy y, por lo tanto, las facultades del mandatario a las dos situaciones que dis-pone la Ley Núm. 160, supra, impone un peso por demás oneroso sobre su derecho constitucional a la intimidad y a la dignidad del ser humano que no se justifica. Lo que supone un grave problema de inconstitucionalidad de la ley, cuando menos, por subinclusión.
Si reconocemos que el derecho a rechazar un tratamiento médico es un interés constitucionalmente protegido (como expresión del derecho a la intimidad en su modalidad de la autonomía individual y como reconocimiento de la inviolabilidad de la dignidad humana), cuando se le regula para circunscribirlo a las dos instancias mencionadas se requiere que el Estado articule una razón preeminente o de superior jerarquía que así lo justifique; lo que ciertamente no ha ocurrido en este caso. No podemos discernir, ni del texto de la ley, ni de su historial legislativo, cuál pueda ser ese interés preeminente que justifique la diferenciación que establece la ley para negar un derecho constitucional. Queda claro, entonces, que las limitaciones impuestas por la Ley Núm. 160 al ejercicio de la libre voluntad del declarante vician esta ley de inconstitucionali *950 dad, por lo que es acertada la determinación que hoy toma este Tribunal.
VI
Unas consideraciones finales. Coinciden en esta controversia planteamientos de carácter religioso, ya que la objeción del señor Hernández Laboy a ser transfundido se fundamenta en los postulados de su religión. Véase 6 Rotunda & Nowak, Treatise on Constitutional Law, Substance and Procedure 4th Sec. 21.9(b)(iii), pág. 224 (2008) (“When the objection to medical treatment is based on religious principles, a serious free exercise clause problem is presented”).(7) Muy en particular, cuando el reclamo de libertad de culto está acompañado de una alegación de que se ha violado también otra disposición constitucional como lo es el derecho a la intimidad y a la dignidad del ser humano. Esto exigiría que se analizara el estatuto bajo el criterio de análisis más riguroso y que se determinara también si la ley, según redactada, se ajusta rigurosamente al interés apremiante que se pretende adelantar. Employment Div. Ore. Dept. of Human Res. v. Smith, 494 U.S. 872, 881-882 (1990). Véase, además, Chemerinsky, op. cit., Sec. 12.3.2.3, págs. 1258-1260.
Ahora bien, en virtud del resultado que llegamos bajo el derecho a la intimidad y a la inviolabilidad de la dignidad humana, estimamos innecesario expresamos en mayor ex-tensión sobre este aspecto que subyace la controversia ante nuestra consideración.(8)
*951 Para concluir, entiendo que el señor Hernández Laboy tenía un derecho constitucional a rechazar la transfusión a la que fue sometido como secuela y exigencia de su derecho a la intimidad y a la dignidad del ser humano y como manifestación también del interés libertario reconocido por la cláusula del debido proceso de ley. Es por ello que estoy conforme con el dictamen mayoritario de que el Art. 6 de la Ley Núm. 160 (24 L.P.R.A. see. 3655) atenta contra los derechos constitucionales de todo declarante, por lo que es patentemente inconstitucional.

 Los términos declaración previa de voluntad, testamento vital y directrices anticipadas (en inglés living wills o advance directives) son comúnmente utilizados como sinónimos para definir un documento a través del cual una persona expresa sus deseos sobre el curso de acción a seguir en cuanto a su tratamiento médico en caso de sobrevenirle una condición futura que le impida expresar su voluntad.

 Surge del expediente que el rechazo de los Testigos de Jehová a las transfusiones de sangre se basa en ciertos pasajes bíblicos que, según su interpretación, les requiere abstenerse de recibir todo tipo de sangre. Por tal razón, creen que un individuo que recibe sangre no resucitará ni tendrá vida eterna. Además, los miembros de dicha congregación entienden que una transfusión de sangre en contra de su voluntad constituye una crasa violación a su integridad física y a sus valores.

 Del expediente surge que el hijo menor de edad no era hijo biológico del señor Hernández Laboy y la señora Lozada Tirado, sino que era su nieto, hijo de uno de los hijos de la pareja que había fallecido. La señora Lozada Tirado expresó al tribunal que ella y su esposo lo habían adoptado legalmente, mas no se presentó evidencia de que tal adopción se hubiese realizado.

 Las Sras. Andrea Hernández Lozada y Elizabeth Hernández Lozada, ambas hijas mayores de edad del señor Hernández Laboy y la señora Lozada Tirado, comparecieron junto a su madre en la petición urgente que ésta presentó ante el foro de instancia.

 No surge de la petición sometida por la señora Lozada Tirado, ni de la minuta de la primera vista celebrada por el foro de instancia, que se informara al tribunal .sobre la existencia del documento de Declaración Previa de Voluntad suscrito por el paciente, el cual ya había sido presentado en el hospital por el señor Tirado Flecha. De hecho, en la segunda vista celebrada por el Tribunal de Primera Instancia, cuando se presentó el documento por la representación legal del mandatario, se hizo constar en la minuta que era la primera vez que el tribunal veía tal declaración.

 La Administración de Servicios Médicos de Puerto Rico es la entidad gubernamental que administra las instalaciones del Centro Médico. 24 L.P.R.A. see. 342 et seq.

 El foro de instancia aclaró que, en vista de las creencias religiosas del señor Hernández Laboy, en la medida en que fuera posible debía administrársele prefereneialmente un sustituto de sangre que fuera aceptado por la Congregación de los Testigos de Jehová.

 En consideración a ello, y a base de la evidencia presentada por los familiares ante el tribunal de instancia de Missouri, el máximo foro federal confirmó la decisión del Tribunal Supremo estatal que determinó que no existía evidencia clara y convincente de que la voluntad de la paciente hubiese sido el retiro del tratamiento.

 Al analizar la presente controversia, somos conscientes de lo señalado por el Prof. José Julián Álvarez González en su obra, al expresar que, en los casos relacionados con las cláusulas constitucionales sobre religión, tanto la jurisprudencia federal como la puertorriqueña reflejan la inevitable tensión entre la libertad de culto y la prohibición de establecer una religión. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 1193.

 En respuesta a la decisión del Tribunal Supremo federal en Employment Div. Ore. Dept. of Human Res. v. Smith, 494 U.S. 872 (1990), mediante la cual dicho foro rehusó aplicar el estándar de interés apremiante en casos en que se reclame que una ley neutral infringe una práctica religiosa particular, en 1993 el Congreso de Estados Unidos aprobó el Religious Freedom Restoration Act (R.F.R.A.), 42 U.S.C.A. sec. 2000bb et seq., el cual fue creado para prevenir que el Estado interfiriese con las prácticas religiosas de los ciudadanos mediante la aprobación de leyes neutrales. Para lograr su propósito, dicha ley dispuso que, al evaluar estatutos que tuvieran un efecto sustancial en una religión particular, debía utilizarse un escrutinio estricto y requerir al Estado demostrar un interés apremiante. 42 U.S.C.A. sec. 2000bb-l. Además, estableció que los ciudadanos podrían instar una acción judicial contra el Estado en casos en que la aplicación de la ley afectara la práctica religiosa en cuestión, íd. No obstante, varios años más tarde el Tribunal Supremo de Estados Unidos determinó que lo establecido en dicha ley federal no podía aplicarse a las leyes estatales al amparo de la Decimocuarta Enmienda de la Constitución Federal, por lo que sólo las leyes federales estaban sujetas a las disposiciones del R.F.R.A. City of Boerne v. Flores, 521 U.S. 507 (1997). Véase, además, J.E. Nowak y R.D. Rotunda, Constitutional Law, 8va ed., St. Paul, West, 2009, Sec. 17.6(d), págs. 1630-1636.

 Sobre el particular, es menester señalar que el Tribunal Supremo de Estados Unidos ha rechazado que al amparo de la Constitución Federal exista el derecho al suicidio, por lo que los estados pueden válidamente intervenir con sus ciudadanos para evitar que éstos se quiten la vida. Véase Washington v. Glucksberg, 521 U.S. 702 (1997).

 Véase, además, J.J. Paris, Compulsory Medical Treatment and Religious Freedom: Whose Law Shall Prevail?, 10 U.S.F.L. Rev. 1 (1975).

 Los tribunates han expresado que el interés del Estado en proteger a terceros inocentes puede ser invocado en casos de emergencias de salud pública. Así, se ha reconocido que el Estado puede aprobar leyes que requieran de manera compulsoria ciertas vacunas ante la amenaza de una epidemia. Véanse: Fosmire v. Nicoleau, 551 N.Y.S.2d 876, 880 (Ct. App. 1990); Jacobson v. Massachusetts, 197 U.S. 11 (1905); J.A. Cohan, Judicial Enforcement of Lifesaving Treatment for Unwilling Patients, 39 (Núm. 4) Creighton L. Rev. 849, 895 (2006). En Puerto Rico, por ejemplo, la Ley Núm. 25 de 25 de septiembre de 1983 regula lo concerniente a la inmunización de estudiantes y niños de edad preescolar y permite que se exima de dicho requisito a los niños que demuestren que ellos o sus padres pertenecen a una religión que no permite la inmunización. 24 L.P.R.A. sec. 182d. No obstante, dicha exención quedará sin efecto en caso de una epidemia declarada por el Departamento de Salud. Id.

 En el caso de Dubreuil, el tribunal resolvió que no se podía presumir el abandono y que, en ese caso particular, no se presentó prueba clara y convincente de que nadie más podría hacerse cargo de los menores. Matter of Dubreuil, 629 So.2d 819, 824-828 (Fla. 1995). Véase, además, Public Health Tr. of Dade County v. Wons, 541 So.2d 96 (Fla. 1989).

 Similar lenguaje utilizó la Asamblea Legislativa al expresar que “las obligaciones del mandato se activan, luego de ocurrida la incapacidad de facto”. Exposición-de Motivos, Ley Núm. 160 (2001 (Parte 1) Leyes de Puerto Rico 810).

 Al resolver que el señor Tirado Flecha posee legitimación activa para impugnar el dictamen del tribunal de instancia, no estimamos necesario pronunciarnos sobre la legitimación activa de la Congregación de los Testigos de Jehová.

 Cabe señalar que el Art. 15 de la Ley Núm. 160, dispone que “[e]n caso de que un tribunal declarare alguna disposición de esta Ley nula, ineficaz o inconstitucional, dicha determinación no afectará las restantes disposiciones de la misma”. 2001 (Parte 1) Leyes de Puerto Rico 815.

 Resulta pertinente resaltar que los tribunales estatales han negado legitimación a una institución hospitalaria para invocar el interés del Estado en evitar el abandono de los menores y así obligar a un paciente a recibir tratamiento médico en contra de su voluntad. The Stamford Hosp. v. Vega, 674 A.2d 821, 829 (Conn. 1996). De hecho, en algunas jurisdicciones se ha exigido la comparecencia del Estado por medio de un fiscal o procurador para poder dilucidar los méritos de un caso en el que se invoque algún interés del Estado que deba ser sopesado con el derecho constitucional de un paciente adulto de rechazar tratamiento médico. Véase Matter of Dubreuil, supra.
*930 En el caso de autos, a pesar de que se trataba del hospital del Estado —representado por ASEM— su comparecencia no fue para representar el interés del Estado en evitar el posible abandono de un menor. De hecho, del expediente surge que la razón por la cual la esposa del señor Hernández Laboy acudió al tribunal a solicitar la orden fue porque el hospital se negó a realizar la transfusión, por respeto a los deseos del paciente.

 Según surge de la resolución emitida por el Tribunal de Primera Instancia, el señor Hernández Laboy y la señora Lozada Tirado habían procreado seis hijos, de los cuales uno —el padre del menor de edad— había fallecido.

 Cabe señalar que del historial legislativo de la Ley Núm. 160 surge que otros grupos religiosos mostraron preocupación con que se restringiera la ejecutabilidad de las declaraciones anticipadas de voluntad a un estado de permanente inconsciencia, aun cuando una persona que no estuviera en tal condición rechazara algún tratamiento médico conforme a sus valores y creencias. Véase Ponencia del Profesor de Teología Moral y Bioética, Jorge J. Ferrer, quien declaró ante la Comisión de lo Jurídico del Senado a nombre de la Federación Puertorriqueña de Bioética y de la Arquidiócesis Católica de San Juan.

 24 L.P.R.A. sec. 3651 et seq.

 El Tribunal de Primera Instancia estimó que existía un interés particular que justificaba ordenar la transfusión de sangre al señor Hernández Laboy, incluso en contra de su voluntad declarada. Estimó dicho foro como una razón válida para emitir la orden, el hecho de que el declarante tenía un hijo menor que dependía de él para su sustento. No obstante, en consideración a la voluntad del declarante, precisó el foro de instancia que la transfusión sólo procedería como último recurso.

 La expresión mencionada, la tomo prestada de la ponencia del Dr. José Rafael Echevarría, Catedrático de Filosofía y Bioética, quien depuso a nombre de la Federación Puertorriqueña de Bioética, ante la Comisión de lo Jurídico del Senado de Puerto Rico en ocasión de la discusión del P. de la C. 386, que se convirtió en la Ley Núm. 160 de 17 de noviembre de 2001 (24 L.P.R.A. sec. 3651 et seq).

 Según esto, son relevantes las reflexiones siguientes del profesor Andréu García Aznar:
“[E]s posible interpretar, en el contexto de una sociedad plural, que el derecho a la vida es un derecho a que no nos la quiten y a que no nos obliguen a vivirla en contra de nuestras creencias si ello no perjudica a terceros y aunque tal decisión no sea *940 acorde con la mayoría de la población. Visto así el derecho a la vida sería vivir de acuerdo con nuestras creencias y nuestras dudas, nuestras afirmaciones y nuestras contradicciones, nuestras ilusiones y nuestros pesares, avanzando y retrocediendo y eligiendo en libertad aquello que deseamos. Ese deseo a vivir de ese modo no estaría por encima del derecho de otros a vivir de otra forma, no pudiéndonos adjudicar el derecho a que otras personas viva o mueran, por nuestras creencias.” A. García Aznar, Sobre el respeto a la autonomía de los pacientes, en M. Casado (comp.), Estudios de Bioética y Derecho, Valencia, Ed. Tirant lo Blanch, 2000, pág. 209.

 Véanse, además: Z.R. Figueroa Berríos, La nutrición e hidratación en los testamentos vitales en Puerto Rico: imposición de valores por el Estado, 76 Rev. Jur. U.P.R. 1271 (2007); P.J. Cabán Vales, El derecho a morir en el contexto del derecho a la intimidad: rechazo de tratamiento médico vital, eutanasia y suicidio asistido, 72 Rev. Jur. U.P.R. 1139 (2003); T. Medina Monteserín, El Derecho a una muerte natural: manifestación última de la libertad personal y de la autonomía individual, 60 Rev. Jur. U.P.R. 295 (1991).

 Como sabemos, estas secciones provienen de la Declaración Universal de los Derechos del Hombre y la Declaración Americana de los Derechos y Deberes del Hombre, lo que convierte a estas últimas en referentes válidos a la hora de proveerle contexto y contenido a las protecciones que le ofrece nuestra Constitución a los ciudadanos.

 Sobre este asunto véanse, a modo de ejemplo los casos siguientes, entre otros: Wons v. Public Health Tr. of Dade County, 500 So.2d 679 (1987); In re Milton, 505 N.E.2d 255 (1987); St Mary’s Hosp. v. Ramsey, 465 So. 2d 666 (1985); Mercy Hospital, Inc. v. Jackson, 489 A.2d 1130 (1985); In re Brown, 478 So. 2d 1033 (1985); In re Brooks’ Estate, 205 N.E.2d 435 (1965); Holmes v. Silver Cross Hospital of Joliet, Illinois, 340 F. Supp. 125 (N.D. Ill. 1972); In re Osborne, 294 A.2d 372 (1972).

 Aun cuando nosotros no nos habíamos enfrentado a esta controversia en el pasado, no así el Tribunal de Apelaciones. Véase Watch Towerand Bible Tract Society of Pennsylvania, Inc. v. ELA, KLAN95000721.